HAGUE v. DeLONG.

BROKERS—COMMISSIONS—EQUALLY DIVIDED COURT.
   In assumpsit by brokers for commissions claimed to be due for
   arranging the sale of all of the capital stock of a corporation,
   judgment for defendants is affirmed by an equally divided court.

Appeal from Washtenaw; Sample (George W.), J.
Submitted October 17, 1939. (Docket No. 75, Calen-
dar No. 40,762.) Decided February 14, 1940. Re-
hearing denied April 1, 1940. Reconsideration de-
nied March 11, 1941.

Assumpsit by Samuel Hague and others, copart-
ners doing business as Whitlock, Smith & Company,
against David A. DeLong, Francis J. Lapointe, and
Ada Cox Lapointe, individually and as trustees for
E. J. Lapointe, June Lapointe Bridges, and Esther
E. Lapointe, for commissions due on sale of business.
Samuel Hague and others, copartners doing business
as Smith, Hague & Company, substituted as parties
plaintiff. Judgment for defendants. Plaintiffs ap-
peal. Affirmed by an equally divided court.

*Beaumont, Smith & Harris* (*Hal H. Smith, Frank
B. DeVine,* and *Lewis S. Robinson,* of counsel), for
plaintiffs.

*Burke & Burke,* for defendants David A. DeLong,
Francis J. Lapointe, and Ada Cox Lapointe, trus-
tees.

*Raymond A. Fox,* for defendants Francis J. La-
pointe and Ada Cox Lapointe.

POTTER, J.   This is a suit at law in which plaintiffs, a brokerage firm and copartnership formerly doing business under the name of Whitlock, Smith & Company, seek to recover from defendants certain commissions claimed to be due them for arranging the sale of all of the capital stock of the American Broach & Machine Company, of Ann Arbor, Michigan, to the Sundstrand Machine Tool Company, of Rockford, Illinois.   Suit was begun August 10, 1936, but was dismissed in May, 1937, on the ground plaintiffs were violating the statute of frauds by seeking to recover a commission on a parol contract involving the sale of an interest in land.   Upon appeal to this court, the case was reversed and remitted to the circuit court.   *Hague* v. *DeLong,* 282 Mich. 330. Thereafter the case was tried without a jury, and from judgment for defendants, plaintiffs have appealed.

Plaintiffs' declaration contains three counts: *First,* against appellee Francis J. Lapointe alone, upon an express contract; *second,* against all of the former stockholders of the American Company, upon such express contract; and, *third,* upon the common counts for recovery upon an implied contract for a reasonable commission.   Plaintiffs' right to recover is founded upon negotiations carried on between R. Harold Hyde, an employee of plaintiffs since 1933, and Francis J. Lapointe, the controlling owner and president of the American Company.   Mr. Hyde first became interested in the sale of the American Company in 1930 when he was offered one-half of a 10 per cent. commission to be paid Apple-Cole Company by defendant Francis J. Lapointe for the sale of the stock of the American Company.   After the termination of the Apple-Cole contract in April, 1930, Hyde was approached by Lapointe, who asked him to find a purchaser of the American Company.

From April, 1930, until August, 1935, Hyde unsuccessfully tried to arrange a sale of the American Company. During this time he frequently corresponded with Lapointe, who upon three occasions called upon Hyde to discuss matters relative to the proposed sale.

August 29, 1935, Hyde visited Lapointe at Ann Arbor. Hyde testified that it was there agreed that he was to devote his time to finding a purchaser of the capital stock of the American Company, that Whitlock, Smith & Company "would charge him a commission of 10 per cent. payable if, as and when," the sale to be "on a basis of net worth, as determined by an audit and appraisal, plus 10 per cent. for patents and good-will, patent licenses and goodwill." Lapointe denied any such agreement. He said Hyde called upon him at his office August 29, 1935, but that all he did was ask about Kearney & Trecker Company, a manufacturing company in Milwaukee, Wisconsin, and ask for a letter of introduction to Mr. Edwards, its vice-president. The following day, August 30, 1935, Hyde is purported to have written a letter to Lapointe which in effect confirmed the agreement made in Ann Arbor the day before. Defendants denied receiving this letter although counsel for defendants admitted it was written and the record unquestionably shows it was stamped and mailed. September 5, 1935, Hyde sent a letter to the Sundstrand Company stating that Whitlock, Smith & Company were authorized to offer for sale "all of the capital stock" of an unnamed broaching company. September 6th, the Sundstrand Company, through Mr. Hugo Olson, president and general manager, replied that it was sufficiently interested to desire more information. Following an exchange of correspondence between Hyde and Olson, a meeting was arranged at Ann

Arbor November 8th between the Sundstrand officials and Mr. Lapointe. At this conference Lapointe explained that he was tired of running the whole business and that it was his desire to sell the entire business, including the capital stock, the real estate, and the patents, and become associated with the purchasing company in a capacity where he could devote his time to development and invention. In reply to Lapointe's statement that he desired to sell the real estate, the Sundstrand officials stated their company did not wish to acquire additional real estate and suggested that Lapointe lease the real estate.

Following an exchange of letters in which Hyde intimated that Lapointe might be willing to drop the sale of the real estate, a second conference was held, this time at Chicago on December 7th. Although no agreement was reached as to the real estate, it was clearly apparent that Sundstrand was seriously considering buying the American Company. Arrangements were made to send auditors from the Sundstrand Company to Ann Arbor to audit the books of the American Company, the purpose of the audit being to establish the net worth of the American Company. The conference was adjourned at noon, and Hyde and Lapointe took the 12:30 train for Ann Arbor. Lapointe testified that it was on the train he had the first intimation that Hyde was expecting to be paid a 10 per cent. commission. He testified:

"On that trip back from Chicago, the last part of the trip, Mr. Hyde was making some pencil figures on a paper which I didn't pay much attention to until he spoke to me. After totalling these up he advised that he figured that their cash amount for him would be $40,000, or more, and that rather startled me because I couldn't see where the deal was going to develop to any point where there would be that much involved for his services, because I

had not entered into any contract at that time with him. He had been asking me continually to let him keep trying to interest someone, and when he had them, I intended to enter into a contract with him, which I tried to do a little later, and I didn't say much more that day but got to thinking about it and I knew, with the expense that was going to be involved and the net amount I would receive after paying taxes and buying the other stock, it looked to me as if the figures he set for his services was certainly out of reason."

Lapointe visited the Sundstrand plant at Rockford December 12th, and on the 14th called at Whitlock, Smith & Company to see Hyde. At this point, the testimony again becomes sharply conflicting. Hyde testified that at this time Lapointe told him that "while he liked the thought of the deal with the Sundstrand Machine Tool Company that he did not feel he could go ahead with the deal unless we would be willing to accept half of the commission, or 5 per cent. from him and try to collect the other 5 per cent. from Sundstrand." Lapointe said he called upon Hyde because he thought the Sundstrand people were actually interested in buying the business and he was anxious to make an agreement as to the amount of commission to be paid Hyde. He testified:

"I had no agreement up to that time with him. He just had been previously asking me to let him continue to see if he could find someone he could interest in it, and I had never taken any of these seriously. * * * I made a suggestion there that if the deal ran up to $100,000, that I considered $3,000 would be a good reimbursement for his services. If it went over that, that $4,000 would be a good amount for him to receive, and if it was over $200,000, that I figured $5,000 would be a very good amount for

his services in making the contract. * * * When I made this proposition Mr. Hyde said nothing definite other than he wanted to consider it and study it over, and then the matter reverted back to the conversation that it might be possible to get them to consider the buildings and land, and so forth.''

December 23d the American Company declared a dividend payable in real estate and buildings, thus segregating from the assets remaining in the company all real estate. Four days later, December 27th, Lapointe again came to the offices of Whitlock, Smith & Company where Hyde again demanded a 10 per cent. commission and Lapointe again offered to pay a smaller amount. After trying without success by telephone on December 31, 1935, and January 2, 1936, to agree as to amounts payable on commissions, Lapointe, February 4, 1936, signed a contract under which the Sundstrand Company acquired the American Company.

Under the terms of this contract, Sundstrand purchased all of the outstanding stock (297 shares) of the American Company. Of this amount, 175 shares were owned by Mr. and Mrs. Lapointe as joint tenants; 114 shares by Mr. and Mrs. Lapointe in trust for their three children; and 8 shares by Mr. De-Long. Sundstrand also purchased the services of Mr. Lapointe for five years; certain patents, patent applications and inventions owned by Lapointe individually; certain patents, patent applications and inventions owned by Metal Cutting Tool Service, Inc., an Ohio corporation, entirely owned by Lapointe; a five-year lease from Mr. and Mrs. Lapointe of the land and buildings; and an option to purchase the land and buildings within three years at an appraised value of $148,000. Under the terms of the contract, Sundstrand gave Lapointe, as consideration for what it had purchased, 29,145 shares of

Sundstrand stock at a value of $10 a share. This represented the appraised value ($291,450) of the American Company. Simultaneously with the delivery to Lapointe of the 29,145 shares of Sundstrand stock, McGowan, Cassidy & White, Inc., brokers, purchased 25,945 shares for which they gave Lapointe a check for $259,450. From the $259,450 and 2,418 shares of stock thus acquired, Lapointe gave $14,000 and 782 shares of stock to DeLong as consideration for DeLong's interest in the corporation.

At the conclusion of the testimony, the trial judge made certain findings of fact. The findings of fact relevant to the determination of this case are:

1. Plaintiffs had an oral agreement with defendant Francis J. Lapointe to effect a sale of the business of the American Broach & Machine Company;

2. The facts make it clear that it was an implied term of this contract that the plaintiffs were to be paid a reasonable commission for its performance;

3. The Sundstrand Company was not ready, able and willing to buy the business on the terms on which plaintiffs had a special contract to sell;

4. Plaintiffs' agreement with Francis J. Lapointe was not for a sale of stock, but for a sale of the business of the American Broach & Machine Company.

The trial judge then held as a matter of law: (1) plaintiffs could not recover upon an express contract for 10 per cent. as they had no contract; (2) plaintiffs could not recover upon the common counts because (a) plaintiffs did not find a purchaser who was willing to buy upon the terms and conditions upon which plaintiffs were employed to sell; (b) the contract between Hyde and Lapointe was for the sale of real estate and not being in writing was void under the statute of frauds (3 Comp. Laws 1929, § 13417 [Stat. Ann. § 26.922]); (c) plaintiffs were

not licensed as business chance brokers as required by statute of any person or partnership which sells businesses as a whole or partial vocation (2 Comp. Laws 1929, § 9806 [Stat. Ann. § 19.791]). Plaintiffs have appealed to this court under Court Rule No. 64 (1933) and the decision in *Jones* v. *Eastern Michigan Motorbuses,* 287 Mich. 619, claiming the findings of fact of the trial judge are "against the preponderance of the evidence," and that as a matter of law plaintiffs should recover upon the common counts.

At the outset, it may be said that the trial judge was in error as to the first two reasons assigned by him for denying recovery upon the common counts. Unless the principal has by clear language so conditioned his promise to pay commissions that the commission is payable only if the broker sells upon the originally specified terms, the broker is entitled to his commission if he produces a purchaser upon such modified terms as the principal may subsequently accept before the agency is revoked. 2 Restatement of Law of Agency, pps. 1120, 1121, § 447, comments *a* and *b*; *MacMillan* v. *C. & G. Cooper Co.,* 249 Mich. 594. The record reveals that long before the agency was revoked, Lapointe had receded from his original terms and had shown a willingness to sell the business without including the real estate. Nor is recovery prevented by the statute of frauds (3 Comp. Laws 1929, § 13417 [Stat. Ann. § 26.922]). Although the original agreement which called for a sale of the real estate was within the terms of the statute (*Morris* v. *O'Neill,* 239 Mich. 663), this court has held that the sale as actually consummated was enforceable without a writing. *Hague* v. *DeLong, supra.* As defendant Francis J. Lapointe acquiesced in the terms of the sale as actually consummated, he should not be able to claim there may be no recovery simply because his original

agreement with plaintiffs was within the statute. It may also be observed that nowhere in the record does it appear that Lapointe purported to act for the other defendant stockholders or act as their agent in the sale of the American Company. Thus, plaintiffs' right of recovery, if it exists at all, is against Francis J. Lapointe alone. Counsel for Lapointe frankly admit that Hyde was the procuring cause of the sale and that Lapointe did have a contract with Hyde to pay him the reasonable value of his services if he were successful in finding a purchaser for the American Company. Counsel claim, however, that plaintiffs may not recover upon the common counts since plaintiffs were not licensed under the business chance statute. Thus, the issues to be determined by this court are: (1) does the preponderance of the evidence establish an express contract under which defendant promised to pay Hyde a commission of 10 per cent. of the sale price; (2) does the preponderance of the evidence establish a contract for the sale of a business or a sale of stock; (3) if the preponderance of the evidence establishes an agreement for the sale of a business, are plaintiffs prevented from recovery for want of a license to sell businesses?

This court should be extremely reticent to disturb the findings of fact of the trial judge. Plaintiffs' claim that there was an express contract for 10 per cent. commission and that the contract was for the sale of stock rather than a business is predicated upon the meeting between Lapointe and Hyde on August 29, 1935. Yet, 573 pages of printed record and 148 pages of exhibits contribute surprisingly little to the determination of exactly what occurred on August 29, 1935. With but few exceptions, the conflicting claims are almost entirely supported by the bare words of the contesting parties. In such

cases, this court must remember that the trial judge, who alone has had the opportunity to observe the witness and hear his testimony, is the best judge of the veracity of the conflicting versions of testimony. In such instances, this court should not seize upon every bit of contradiction and scrap of evidence and magnify its importance until it assumes a probative force wholly incommensurate with the facts.

"We are reluctant to disturb findings which involve the adoption of one of two conflicting versions in testimony." *Paton* v. *Stealy,* 272 Mich. 57.

"We are not ordinarily inclined to substitute our determination for that of the trier of the facts, especially when there is a conflict of testimony." *Buhler* v. *City of Detroit,* 274 Mich. 139.

" 'The law permits the trier of the facts a wide discretion in determining what those facts are. We do not substitute our judgment on questions of fact unless they clearly preponderate in the opposite direction.' " *Rubsam Corp.* v. *General Motors Corp.,* 281 Mich. 691.

If it were for no other reason than this, we are of the opinion in this case that the findings of fact of the trial judge should be affirmed. However, without even going beyond the bare words of the record, we are convinced that the preponderance of the evidence shows: (1) there was not a contract to pay plaintiffs a 10 per cent. commission; and (2) the contract was for the sale of the business and not for a sale of stock.

1.   On direct examination, Hyde testified that his contract with Lapointe was the same as he had had with him on prior occasions.  As to a previous agreement with Lapointe, he testified upon direct examination:

"It was either in January or February, 1933, Mr. Lapointe came to see me again, visited me at my

home when I was ill and confined to my room. We discussed another deal at that time. He wanted me to go to work again, try and work out a deal for the sale of either' all or part of the American Broach and made the same agreement as to commission, 10 per cent. payable if, as and when. That was 1933.''

Yet, on cross examination, his story of previous agreement was badly shaken.

"*Q.* Didn't you testify in your direct examination that when he came to your home he wanted you to go ahead, and you made an agreement to go ahead on a basis of a 10 per cent. commission?

"*A.* The 10 per cent. commission arrangement was discussed at the time Mr. Lapointe came to my home; whether it was 1931 or 1933 I can't be certain.

"*Q.* Well you made that agreement with him at the time you were sick in your home?

"*A.* Yes.

"*Q.* And your best recollection is that it was in 1931?

"*A.* I'm not certain. I have told you I was ill in the late winter of 1931 and again in 1933 and I can't be certain which time it was Mr. Lapointe came to the house. * * *

"*Q.* Then you are uncertain whether you had the agreement with Mr. Lapointe in 1933, is that true?

"*A.* I had another agreement with him at that time because I went to work, endeavoring to work out a deal again in 1933 for a short time. I spent only a very little effort on it.

"*Q.* Well, if the agreement was not made at your home when you were sick in 1933, when and where was it made?

"*A.* I can't tell you that, whether it was made in the office or over the phone, or in his office, because I stopped out here at the American Broach frequently when I was driving this way.

"*Q.* Then you are not certain as to the date or place, when or how, but you are still certain that you had an agreement?

"*A.* I had an agreement, certainly."

Hyde was asked if he had ever had a written contract with Lapointe for 10 per cent. commission. He said he had a written agreement with him in 1930 or 1931. When called upon to produce the contract, he said it was lost in 1936 when he had moved. It is, indeed, extraordinary that an astute business man like Mr. Hyde, who was representing another in an important financial transaction involving a substantial sum of money, could not produce a single writing or contract showing the terms of his employment. The best proof submitted by plaintiffs that there was a contract for 10 per cent. is the letter written by Hyde to Lapointe August 30, 1935. That part of the letter most favorable to plaintiffs reads:

"These negotiations will, of course, be handled in the name of Whitlock, Smith & Co., and in the event it should be possible for us to work out a deal for the sale of all or a portion of your business on terms and conditions satisfactory to you along the lines and basis discussed with you yesterday, we would want a commission of 10 per cent. payable if, as and when payments are made to you."

Lapointe denied that he received this letter, although the record clearly shows it was stamped and mailed. However, this letter would seem to negative, rather than confirm, the claim that on the preceding day there was a contract made for 10 per cent. commission. By the terms of the letter, the matters "discussed with you yesterday" related to the terms and conditions at which Hyde was to offer the business to a prospective purchaser and were exclusive of the amount of commission to be paid.

In their brief, plaintiffs argue that Lapointe's silence after receiving the letter was an acceptance and thereby a definite contract came into existence. But plaintiffs' declaration states that the contract was made on August 29, 1935, and that the letter of August 30, 1935, is merely confirmation thereof. In such instances, the pleading is controlling.

Hyde's method of conducting negotiations suggests that he did not have an agreement for a 10 per cent. commission. He testified that Lapointe told him the approximate net worth of the American Company was $470,000, of which $148,000 was real estate. If the business were sold for $470,000, then, at 10 per cent., Hyde would receive $47,000; if it sold for the net worth minus the real estate, then he would receive $32,200. Yet, the undisputed record shows that shortly after negotiations began, Hyde wrote Mr. Olson relative to the real estate that "it is possible that he (Lapointe) might be willing to consider some adjustment or concession which would conform to your ideas and plans." The abandon with which Hyde cut a possible $14,800 from his commission suggests that he never had a contract for a 10 per cent. commission. One other significant fact appears in the record which suggests that Lapointe expected to pay Hyde a flat fee ranging from $3,000 to $5,000 rather than 10 per cent. of the purchase price. Hyde claimed he had an agreement with Lapointe for 10 per cent. of the purchase price in 1930, 1931, 1933, 1934 and 1935. Yet, the undisputed record shows that Lapointe never treated Hyde as one to whom he was expecting to pay a substantial sum of money. He frequently avoided Hyde, and on occasion did not answer his urgent requests for information. For the five years during most of which Hyde is purported to have represented Lapointe, plaintiffs have offered but seven

letters sent by Lapointe to Hyde. In the letter of
August 30, 1935, Hyde asked Lapointe for a record
of sales and a confidential statement of unfilled
orders. They were never sent. February 8, February 25, and April 29, 1935, Lapointe wrote Hyde
instructing him to drop any negotiations he was carrying on with Vickers Company. August 22, 1935,
Lapointe wrote Hyde that he did not know when he
could arrange to see him. It was Hyde, and not
Lapointe, who requested the conference on August
29, 1935. Lapointe testified:

"I had conversations with him but you will notice
from the letters handed me that I always avoided
going in there and seeing him at his request, and
without saying any unkind words about Mr. Hyde,
my visits to his office were always boresome, because
it always wasted three or four times as much time
as it should to get to the point."

The same point was made by Mr. O'Connor and
Mr. Olson:

"We had no particular reason for ignoring Mr.
Hyde other than that he wasn't very helpful in the
negotiating. I mean his conversations were mostly
about unrelated matters and we felt he wasn't of
any particular assistance to us. We could do it
more quickly ourselves." (Mr. O'Connor)

"That was all that bothered us about Mr. Hyde
and the fact we didn't seem to get any assistance
in giving us the information which we needed."
(Mr. Olson)

The general impression left by the record is that
Hyde constantly forced himself upon Lapointe, who
tolerated him, who was as surprised as he was
pleased when he produced an interested purchaser,
who made a genuine and persistent attempt to pay
Hyde what he believed was a reasonable fee, but

never would have planned to give a 10 per cent. commission (amounting to $30,000 at least) to one whom he never thought efficient.

Contrasted with Hyde's contradictory testimony and conduct is the consistency of the story told by defendant Lapointe. He frankly admitted that in 1930 he had agreed to pay Apple-Cole Company a 10 per cent. commission, yet he consistently denied ever having made such an agreement with Hyde. During the entire course of the trial, the only serious flaw that appeared in defendant's story was his statement that he did not know Hyde was associated with Whitlock, Smith & Company. He was forced to retract this upon cross examination. On direct examination, Lapointe denied that Hyde had ever represented him prior to 1935. This statement was not shaken when counsel for plaintiffs produced an agreement, signed by Lapointe and the Foster Machine Company, under which William C. Roney & Company, with which Hyde was then associated, was to purchase a portion of the stock issued by the Foster Machine Company. Lapointe said that under this contract the William C. Roney Company represented the Foster Machine Company and Apple-Cole Company represented him. While it is difficult to explain Mr. LaPointe's silence on the train on December 7, 1935, when Hyde informed him that he expected to be paid approximately $40,000, it is even more difficult to explain plaintiffs' silence about the letter purportedly written August 30, 1935. It is, indeed, strange that from the time it was supposedly written until the time of the trial it was never mentioned by plaintiffs, not even in reply to Lapointe's claim that he had never made an agreement with plaintiffs for a commission of 10 per cent.

2. We are likewise of the opinion that the greater and more convincing evidence is that the agreement

was for the sale of the business and not for the sale of stock. Subsequent conduct is always important in determining the nature of prior understandings. *McConville* v. *Remington Rand, Inc.,* 278 Mich. 333. And it is undisputed in the record that subsequently Lapointe sold and Sundstrand purchased not only the stock of the American Company, but also valuable patents and patents pending, the services of Mr. Lapointe, a lease, and an option to purchase the real estate and buildings. In consideration, Sundstrand paid $291,450 (29,145 shares of Sundstrand stock at $10 a share). Not all of the amount paid was for the stock alone. The record is convincing that the Sundstrand Company was buying the business and not the stock. Mr. O'Connor, director and member of the executive committee of Sundstrand Company, testified:

"So far as the machinery was concerned, when we took over the business, we promptly wrote off $40,000. If we intended to get into the broaching machine and tool field we figured it would cost us $200,000 before we could get ourselves established, and that would probably result in some infringement suits, and we figured if we were paying $100,000 or $150,000 more than the assets of this concern was worth, that would be offset by the patents we were buying, the going business and the management that would remain as it was, and we wanted to be sure that we would have a lease on the property with an option to buy at the appraisal value. * * *

"*Q.* Why did you buy the stock of the American Broach?

"*Mr. Smith:* I object to why they bought it. * * *

"*Court:* Take the answer.

"*A.* That was merely a means of obtaining the assets of the concern including the goodwill, patents, leases, options, and services of Mr. Lapointe. It was just a means of arranging payment. * * * We never

considered buying the stock. We were buying the assets and what went along with the assets as a going business.''

We are cognizant that proof in the record that the Sundstrand Company bought the business rather than the stock does not require the conclusion that as between Hyde and Lapointe the agreement was for the sale of the business. But it is persuasive. It would be asking too much to assume that Lapointe would not know in advance that a prospective purchaser would be primarily interested in the business and only secondarily interested in purchasing the stock. It is also very clear from reading the record that Hyde knew that it was the business and not the stock that Lapointe was anxious to sell. The record is replete with statements by Hyde that Lapointe spent considerable time explaining to him the nature of his broaching patents, their value in the business, and his control over them. Through his five years of occasional contact with Lapointe, Hyde had learned that the patents controlled by Lapointe personally, his managerial ability, and the strategic location of the plant near the automotive industry were indispensable in the success of the American Company. He also knew that a sale of stock would not include the services of Lapointe. He knew, too, that many of the more important patents were not owned by the American Company, but were used by it under a contract with Lapointe and Metal Cutting Tool Service, Inc., a corporation wholly owned by Lapointe. It is wholly unreasonable to believe that Hyde would agree to sell stock alone when an indispensable part of the American broaching business was an item which would not pass with the sale of the stock. Had Lapointe intended to sell the stock and not the business, it is probable that he would have employed a stockbroker. It is significant that

he employed Mr. Hyde who, according to the record, was not an ordinary stockbroker but an industrial broker who on other occasions had sold businesses. On cross examination, Hyde testified:

"*Q.* So your work has included other things than the sale of capital stock? It has included the sale of businesses, is that right?
"*A.* Yes."

Hyde's testimony that he was employed to sell stock only was not convincing. Early in the trial, he was asked: "All of these deals had relation, did they not, to stock?" He answered: "Never anything else. Never anything else." Yet, a bit later, he testified:

"I neglected to state that one of the considerations of his deal was to be an employment contract over a period of five years."

Certain of Hyde's testimony is almost an admission that his agreement with Lapointe on August 29, 1935, was for the sale of a business. We quote from the record:

"*Q.* Then Mr. Lapointe's problem that he came to you with was that he wanted to be relieved of responsibility and the burden he had in his business. He wanted someone else to take it over. Isn't that true?
"*A.* Partially, yes. * * *
"*Q.* So, in substance, he said to you, 'Mr. Hyde, I want to get out from under the responsibility and I want an employment contract with the company that takes the business over.'
"*A.* That's right.
"*Q.* Now, the problem could have been solved by the sale of the assets of the business, as well as by a sale of the stock, couldn't it?
"*A.* Possibly.

"*Q.* Well, couldn't it?

"*A.* By a complete liquidation of the American Broach and a sale of the assets.

"*Q.* Yes, by Sundstrand buying the assets from the American Broach instead of buying the stock?

"*A.* Well, no—yes, it might have been worked out on such a basis, but not at the price that was secured."

The precariousness of plaintiffs' position appears from the fact that the proof upon which it most strongly relies—the letter of August 30, 1935—does not use the word "stock," but instead uses the word "business." The letter reads:

"And in the event it should be possible for us to work out a deal for the sale of all or a portion of your *business* on terms and conditions satisfactory to you along the lines and basis discussed with you yesterday, we would want a commission of 10 per cent."

It has been held that a business may be sold by means of selling the stock. *O'Brien* v. *Dunn Iron Mining Co.*, 141 Mich. 616. In such an instance, it is not the stock that is sold but the business, and the stock is just a convenient method of making the sale. Whether an agreement is for the sale of stock only, or for the sale of a business with the stock as incidental thereto, depends upon the facts in each case. Here, the fact that Lapointe did not go to an ordinary stockbroker but to a seller of businesses, that he told Hyde he did not wish to sell his stock alone but his services too, that as a reasonable man he must have understood a purchaser would be interested in the business and not the stock, and that the letter offered as confirmation of the agreement speaks of the contract as one for the sale of the business, all lead to the conclusion that Hyde was

employed to sell the business. We reach this conclusion despite the fact that in May, 1930, Lapointe signed a contract with the Foster Machine Company under which admittedly only the stock of the American Company was sold. During the five and one-half years which elapsed between the time of that contract and the negotiations with Sundstrand Company, the machinery and equipment of the American Company had become less and less valuable, while the services of Lapointe, his control over the patents, and the location near Detroit had assumed a greater value.

3. The final issue for decision is whether plaintiffs are prevented from recovery upon the common counts for want of a license to sell businesses. Plaintiffs were licensed to sell stock and deal in securities, but had no license to sell a business as required by the business chance statute providing:

"It shall be unlawful for any person, firm, partnership * * * to engage in the business or capacity, either directly or indirectly, of a business chance broker * * * within this State without first obtaining a license under the provisions of this act." 2 Comp. Laws 1929, § 9806 (Stat. Ann. § 19.791).

"A business chance broker within the meaning of this act is any person, firm, partnership association, copartnership or corporation, who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, leases or offers to lease, or negotiates the purchase or sale or exchange of a business, business opportunity, or the good will of an existing business for others as a whole or partial vocation." 2 Comp. Laws 1929, § 9807 (Stat. Ann. § 19.792).

The purpose of the law, said this court, is to require a license of:

"those who for compensation perform the acts of agency enumerated 'as a whole or partial vocation.' * * *

"It can be safely said without reviewing the authorities that the courts have quite generally held that a single sale or act of a private citizen in relation to a vocation prohibited by statute without a license is not, standing alone, carrying on the forbidden business." *Miller* v. *Stevens,* 224 Mich. 626.

The record discloses beyond contradiction that the sale of the business of the American Company was not the first business that Hyde had sold. Under such circumstances, plaintiffs may not recover upon the common counts.

Judgment affirmed, with costs in both courts to appellees.

SHARPE, CHANDLER, and MCALLISTER, JJ., concurred with POTTER, J.

NORTH, J. This is a suit at law in which plaintiffs, a copartnership, seek to recover from defendants a substantial sum of money which plaintiffs claim is due them as commission earned incident to the sale of the stock of the American Broach & Machine Company of Ann Arbor, Michigan, to the Sundstrand Machine Tool Company of Rockford, Illinois. The case was heard in the circuit court without a jury and judgment entered for defendants. Plaintiffs have appealed.

Herein we designate these companies as the American Company and the Sundstrand Company respectively. The partnership which originally started this litigation was doing business as Whitlock, Smith & Company, but during the course of the litigation the copartnership of Smith, Hague & Company was substituted as plaintiffs, this evidently being due to some change in the personnel. R. Harold

Hyde was a stockbroker employed by Whitlock, Smith & Company. He and defendant Francis J. Lapointe had been acquainted and had some business relations extending back as far as 1930. Mr. Lapointe was the controlling factor in the American Company, a Michigan corporation. The transaction out of which this litigation arises had its inception in August, 1935. At that time the American Company had outstanding 297 shares of stock of the par value of $100 each. Two hundred eighty-nine shares of this stock stood in the joint names of Francis J. Lapointe and his wife Ada Cox Lapointe. The remaining 8 shares were held by Mr. David A. DeLong, associated with Mr. Lapointe in the American Company.

It is plaintiffs' claim that in 1935 Mr. Lapointe, being desirous of disposing of the whole or a substantial part of his stockholdings in the American Company, arranged with Mr. Hyde, as an associate of Whitlock, Smith & Company, to find a buyer; and plaintiffs claim that the agreed commission to be paid in event of a sale was 10 per cent. of the proceeds of the American Company stock. Defendants deny that there was such an agreement. But in any event, the undisputed record is that Mr. Hyde actively sought a buyer for the American Company stock and contacted several prospects whom it was thought might meet the requirements of the contemplated transaction, which was that some concern in a kindred line of manufacturing might take over and continue the activities of the American Company which was engaged in the business of manufacturing broaching machines and tools. Early in September, 1935, Mr. Hyde contacted representatives of the Sundstrand Company, and from that time over a period of approximately three months he put forth almost continuous efforts to consummate a deal with

the Sundstrand Company; although in the meantime he was also endeavoring to determine whether other parties might be interested. The record is replete with evidence disclosing the vigor and persistency with which Mr. Hyde gave attention to this transaction. Such evidence is not only found in the oral testimony of Mr. Hyde, but also in the oral testimony of defendant Lapointe and of defendants' other witnesses, as well as in an abundance of documentary exhibits consisting of letters, telegrams, and records of long distance telephone communications. On November 8, 1935, the representatives of the Sundstrand Company came to Ann Arbor to inspect the American Company's plant and for a conference concerning details of the transaction then partially developed through negotiations with Mr. Hyde. It was on this occasion that Mr. Lapointe first met these representatives. Approximately a month later (December 7th), Mr. Lapointe and Mr. Hyde went to Chicago and there met and had further negotiations with the Sundstrand representatives. By this time it had become evident that the Sundstrand Company, which was engaged in the manufacture of milling and other machines, was much interested in going into this broaching business in which the American Company was engaged; but it also developed that the Sundstrand Company was not interested in purchasing certain assets held by the American Company, including its real-estate holdings in Ann Arbor, Michigan. Matters had now progressed to such a point that it was agreed there should be an audit and appraisal of the American Company's assets. Mr. Lapointe and Mr. Hyde returned from Chicago on the same train and en route discussed the matter of a deal being consummated which would not include the Ann Arbor real estate, and, as will be hereinafter noted, according to Mr.

Lapointe's testimony, the matter of the commission which would be payable in case the deal was consummated was also brought up. The record is conclusive that following the Chicago meeting Mr. Hyde continued his efforts by way of furnishing the representatives of the Sundstrand Company with further information concerning the subject matter of the transaction. With regard to the unwillingness of the Sundstrand Company to purchase the Ann Arbor real estate, which then seemed to be an important phase of the transaction, Mr. Hyde on December 10, 1935, wrote the president of the Sundstrand Company in part as follows:

"I am sure, however, that you will find Mr. Lapointe an exceptionally fair-minded man to deal with and I feel certain that some plan can be worked out which will prove satisfactory to both you and Mr. Lapointe."

On December 12, 1935, Mr. Lapointe went to Rockford, Illinois, to inspect the Sundstrand Company's plant and to contact persons active in its business. On this occasion he was not accompanied by Mr. Hyde, although the latter had expressed his willingness to make the trip. Mr. Lapointe testified:

"I think I told the Sundstrand people I would agree to take the real estate out if there was a deal around the 17th or 18th of December."

After Mr. Lapointe returned from Rockford to Ann Arbor and on December 14, 1935, he went to Detroit and had an interview with Mr. Hyde in the office of Whitlock, Smith & Company. He brought up the matter as to what commission should be paid in case the deal with the Sundstrand Company was consummated. There is dispute in the testimony as to just what occurred, but it is obvious that Mr. Lapointe was seeking to minimize or at least fix at

some definite figure the amount to be paid as commission, and on the other hand Mr. Hyde was of the opinion that since the deal had progressed to the point that its consummation seemed reasonably certain he should be permitted to complete the deal and he or his firm should receive a commission of 10 per cent. Hyde testified that on this occasion Mr. Lapointe proposed that he should pay a commission of 5 per cent. and an effort should be made to secure the payment of the other 5 per cent. from the Sundstrand Company. Mr. Lapointe denies making such a statement. Again on December 27th Mr. Lapointe went to the office of Whitlock, Smith & Company, interviewed both Mr. Hyde and Mr. Whitlock, and made an effort to agree upon the commission to be paid. No agreement was reached. According to the testimony of Mr. Hyde, Mr. Lapointe again took the matter up by telephone on December 31st in an effort to secure an agreement for a fee in a fixed amount which Mr. Hyde and his associates would be willing to accept. As to this Mr. Hyde testified: ''I told him that I could not consider that.'' Mr. Lapointe was taking the position that he could not go ahead and close the deal with the Sundstrand Company on the terms which seemed obtainable if he was to be required to pay a 10 per cent. commission demanded by Mr. Hyde and his associates. While Mr. Hyde attempted to keep in touch and assist in the development of the transaction, he was not permitted to do so after the Detroit conferences concerning commission; and Mr. Lapointe, after an audit and an inventory of the American Company was completed and submitted to the representatives of the Sundstrand Company, closed the deal as of January 31, 1936; although as a matter of fact it was not actually consummated until February 4th. Mr. Lapointe has refused to pay the commission claimed by

plaintiffs on the ground that he never entered into an agreement with plaintiffs or their representative, Mr. Hyde, to pay a commission; and this suit has resulted.

Numerous defenses are urged by defendants; and in so far as they have a decisive bearing upon decision they will be noted and considered hereinafter. Separate consideration of the numerous questions presented will be helpful in reaching an ultimate determination.

1. *Procuring Cause.* The record leaves no room for doubt that plaintiffs' representative, Mr. Hyde, found the prospective purchaser in the Sundstrand Company, that he introduced the parties, that he carried on negotiations over an extended period, and very largely developed the transaction before he was supplanted by Mr. Lapointe who effected the final details which resulted in the agreement with the Sundstrand Company. Even the testimony of defendant Francis Lapointe abundantly justifies this conclusion.

2. *Whom Did Hyde Represent?* There is no testimony tending to establish an agency between Mr. Hyde and any of the parties defendant except Mr. Lapointe; nor is there testimony which as to the other defendants would justify recovery on *quantum meruit.* But it is established that Mr. Lapointe held himself out as able to represent in the contemplated transaction all the members of his family, and hence his liability, if any, must be gauged accordingly. In speaking of a substantial dividend declared from assets of the American Company December 23, 1935, Mr. Lapointe testified:

"It was a close corporation and it didn't make any difference to me whether it was held in this pocket or the other, it was still in the family."

Defendants' witness, O'Connor, testified:

"The first time I met Mr. Lapointe was in the meeting at Ann Arbor. Mr. Lapointe represented as the owners of the stock of the American Broach at that time he and his immediate family. * * * He said it was owned by himself and his immediate family (with the exception of a small amount of stock held by Mr. DeLong), so we decided there couldn't be any question about delivering it. He and his family owned and controlled the business."

Throughout the entire transaction with the Sundstrand Company, clearly Mr. Lapointe by word and act asserted his authority to represent the other members of his family; and he is bound by his own word and his own conduct. Mr. Hyde represented Mr. Lapointe as one who controlled the family stock in the American Company.

3. *Was There an Express Contract?* This is a much controverted issue. While plaintiffs have declared both on express contract and on implied contract, the claim is stressed by plaintiffs that there was an express oral agreement between Mr. Hyde and Mr. Lapointe. Mr. Hyde testified that previously he had sought to interest others in the purchase of stock of the American Company and that his activities in this particular were under an oral agreement with Mr. Lapointe that a commission of 10 per cent. was to be paid in event a transaction was consummated. In giving his direct testimony Mr. Lapointe denied that Mr. Hyde had acted for him in the manner just above noted prior to 1935; but on his cross examination he was confronted with documentary evidence which caused him to retract. We quote briefly from Mr. Lapointe's cross examination:

"*Q.* I'm showing you an agreement made May 12, 1930, and ask if that isn't an agreement between the

Foster Machine Company and Francis J. Lapointe and the American Broach & Machine Company?

"*A.* It is.

"*Q.* Signed by you?

"*A.* Yes.

"*Q.* You recall that agreement, don't you?

"*A.* Yes.

"*Q.* And under that agreement the Roney Company (with whom Mr. Hyde was then associated) had made a proposal to the Foster Machine Company for the purchase of an issue of stock and the proceeds were to be paid to the American Broach, and to you, for your stock in the American Broach?

"*A.* I believe it was that way.

"*Q.* And yet you never had any deal with Roney?

"*A.* Not as stockbrokers.

"*Q.* You had this deal, didn't you?

"*A.* Just what it tells."

Again in his direct testimony Mr. Lapointe was positive that he did not have knowledge until some weeks after the inception of this transaction that Mr. Hyde was associated with plaintiffs' predecessor, Whitlock, Smith & Company. As to this he was confronted on cross examination with two letters written by him early in 1934 in care of Whitlock, Smith & Company and he then testified:

"With these two letters I can see that Mr. Hyde must have been connected with Whitlock, Smith at that time. I wrote them.

"*Q.* So, so far as your testimony that you never knew he was connected with them, why, that's out now, isn't it?

"*A.* So far as he being connected, yes. I would say he was connected there, although my dealings were direct with him."

As to his having an express contract with Mr. Lapointe, plaintiffs' witness, Mr. Hyde, testified in part as follows:

"Mr. Lapointe told me that he and his family, outside of those few shares owned by Mr. DeLong, that he and his family still owned all the stock and he controlled and could deliver all the stock except a few shares owned by Mr. DeLong and that Mr. DeLong had agreed to go along on any deal that was worked out, any deal that Mr. Lapointe worked out for the sale of his holdings. *  *  *

"I told Mr. Lapointe at the time I agreed to go ahead that negotiations would be handled in the name of Whitlock, Smith & Company, and that we would charge him a commission of 10 per cent. payable if, as and when, the same agreement that I had had with him on previous negotiations that I had attempted for him, to which Mr. Lapointe agreed and agreed to give me exclusive right to negotiate for him and all the time I would need. That was on August 29 (1935). That day I was in Mr. Lapointe's office and in the shop about three hours."

On the following day, August 30, 1935, according to Mr. Hyde's testimony, he wrote Mr. Lapointe a letter asking that he be furnished with a more detailed balance sheet than he had previously had, "separating the items under machinery and equipment account and the same with liabilities;" and also asking for a record of sales, unfilled orders, prospective business and a copy of the company's latest catalog. The letter continues as follows:

"I will immediately proceed to establish proper contacts with some of the concerns who should be interested (and)  *  *  *  will personally follow up any leads which appear at all promising.

"These negotiations will, of course, be handled in the name of Whitlock, Smith & Co., and in the event it should be possible for us to work out a deal for the sale of all or a portion of your business on terms and conditions satisfactory to you along the lines and basis discussed with you yesterday, we would want a

commission of 10 per cent. payable if, as and when payments are made to you.''

By a decided preponderance of the evidence it is established that the letter above quoted was written and mailed to Mr. Lapointe at Ann Arbor, Michigan. In fact, the following admission was made in open court by one of defendants' counsel:

"We will admit that there was such a letter. We could not dispute but what he wrote such a letter and the exhibit which Mr. Smith holds in his hand is a copy. We do not admit that Mr. Lapointe received that letter."

Mr. Lapointe very definitely denied having entered into an oral agreement or understanding with Mr. Hyde as outlined in the latter's oral testimony above quoted; and Mr. Lapointe also denied that he ever received Hyde's letter of August 30th.

Notwithstanding this specific denial on the part of Mr. Lapointe, the circumstances of the record are very definitely against him, and the inaccuracies in certain portions of his testimony, some already herein noted, almost force the conclusion that he is wrong and Mr. Hyde is right as to the instant issue. Mr. Lapointe unquestionably attempted to take the position that he had not on previous occasions expressly agreed to pay a specified commission of 10 per cent. But the record shows that at one time Mr. Hyde cooperated with Mr. Apple of Apple-Cole Company in an effort to sell stock of the American Company. This was in 1930. Plaintiffs' counsel on cross examination asked Mr. Lapointe: "Did you. have an agreement with Apple-Cole Company then at 10 per cent. commission?'' Over the objection of defendants' counsel the witness was directed to answer and testified:

"There was an agreement with Apple-Cole, I think a commission stated at 10 per cent., I believe, but I terminated that shortly after because I knew it was prohibitive."

This and other circumstances in the record check much more favorably with plaintiffs' assertion of an express agreement to pay a 10 per cent. commission than with defendants' denial thereof. We note in particular another circumstance. As hereinbefore stated, in December, 1935, Mr. Lapointe made two trips to Detroit in an attempt to adjust the matter of payment of commissions between himself and Mr. Hyde and also made at least one effort over the telephone on December 31, 1935. Shortly after this and as soon as the audit and inventory of the American Company could be submitted to the Sundstrand Company, a final agreement was entered into between the Sundstrand Company and the stockholders of the American Company. Nothing was said in this agreement about payment of commissions; but there was simultaneously executed by the Sundstrand Company a separate instrument in which it is recited:

"The following is my (Mr. Olson, president of the Sundstrand Company) understanding of the agreement which was arrived at between us, namely: You and the other stockholders shall pay the first $5,000 of damages which may be established by Mr. Hyde or his firm; we or the American Broach & Machine Company will pay the next $10,000 of damages which may be so established; and you in turn shall pay any damages over $15,000, which may be so established."

The rather unusual circumstance of this instrument having been executed by the Sundstrand Company as an obvious partial protection to Mr. La-

pointe is quite persuasive that all parties concerned, especially Mr. Lapointe, knew the transaction was being closed under circumstances that might and probably would require the payment of a commission. When Mr. Olson, the president of the Sundstrand Company, was cross-examined about the rather unusual assumption of a contingent $10,000 liability, he testified:

"We made that arrangement in Chicago, the latter part of January at about the time the deal was closed.

"*Q.* Then Mr. Lapointe must have told you that he might be liable for a payment to Mr. Hyde? (No answer.)

"*Q.* What does that gesture mean? — I don't know.

"(Witness) Mr. Lapointe told us that he had offered to pay a flat fee, that there was no agreement in writing, no definite understanding.      *      *      * There was no discussion as to how much we might have to pay. I don't know how we arrived at that figure of $10,000. It was taken out of the air, I guess."

As a further sidelight on the issue of whether Mr. Lapointe was obligated to pay commission, the following may be noted. It was brought out on Lapointe's cross examination that the approximate net worth of the American Company was $410,000, and that on the train when he and Hyde were returning from Chicago, December 7, 1935, the subject of Hyde's commission came up. Mr. Lapointe testified:

"I imagine those are the figures Mr. Hyde used on that train going back from that meeting, when he told me, after making some figures on a piece of paper, that if the deal went through on the basis talked, he would get about $40,000. The $40,000

would be about 10 per cent. of the net worth as we discussed that day.   *   *   *   I don't know whether I told Mr. Hyde anything when he said his commission would run $40,000.''

It surely is passing strange that so far as he could remember Mr. Lapointe in no definite manner challenged Mr. Hyde's assertion that "he would get about $40,000," if this came out of a clear sky without Mr. Lapointe having had any previous notion that he was obligated to pay any commission at all or that the commission would be on the basis of 10 per cent. The foregoing facts and circumstances together with others appearing in the record clearly indicate that at the inception of this transaction Mr. Hyde had an express oral agreement that in event a deal was completed Mr. Lapointe was to pay him a commission. Our review of the record satisfies us that this fact is established by a clear preponderance of the evidence; and we also think it is established by the clear preponderance of the evidence that the oral agreement included payment of the commission at the rate of 10 per cent. In any event, the facts and circumstances disclosed by the record are such as to establish an implied contract which, saving for the moment the questions hereinafter considered, would sustain recovery by plaintiffs.

4. *Character of Hyde's Undertaking and Service.* This topic presents one of the major controversies involved in this litigation. Plaintiffs contend and have alleged in their declaration that Mr. Hyde's agreement with Mr. Lapointe was that the former should proceed to interest or procure a responsible manufacturer of milling machines in the purchase of all of the *capital stock* of the American Company, preferably upon the basis of the net worth of the stock to be established by an audit and appraisal, plus 10 per cent. for good will and patents.

On the other hand defendants deny any such agreement or that this was the character or scope of Hyde's undertaking. Instead, defendants assert that Hyde's undertaking was to sell the *business* of the American Company. If defendants' contention were correct, there could be no recovery because neither Hyde nor the partnership with which he was associated were licensed to engage in the business of selling business chances. See 2 Comp. Laws 1929, § 9806 (Stat. Ann. § 19.791). Mr. Hyde was licensed only to operate as a stockbroker. 2 Comp. Laws 1929, § 9789, as amended (Stat. Ann. § 19.761). If the transaction contemplated and as finally consummated was a sale of stock, as contradistinguished from the sale of a business, this claim of defendants would not bar recovery.

Our review of the record satisfies us that plaintiffs have established their contention that Mr. Hyde's undertaking was the sale of the capital stock of the American Company. In arriving at this conclusion we are mindful that while the trial judge specifically found plaintiffs had "an oral agreement with defendant Francis J. Lapointe to effect a sale," in this connection he also found that such sale was "of the *business* of the American Broach & Machine Company."

Further, it may be noted that the trial judge found:

"5. The facts make it clear that it was an implied term of this contract that the plaintiffs were to be paid a reasonable commission for its performance.

"6. Plaintiffs procured the Sundstrand Machine & Tool Company as a prospective purchaser.

"7. The Sundstrand Company was not ready, able and willing to buy the business on the terms on which plaintiffs had a special contract to sell."

In the main it was because of the above findings that the trial court rendered judgment in favor of defendants. We are not in accord with the finding that the undertaking of Mr. Hyde was ''a sale of the business'' or that the Sundstrand Company was ''not ready, able and willing to buy'' on terms under which plaintiffs or their representative were authorized to sell.

It may be admitted that the Sundstrand Company was primarily interested in and desirous of buying a ''business,'' particularly a broaching business such as that of the American Company, and that the Sundstrand Company was not at all interested in making an investment in capital stock, as such. But this circumstance is not at all conclusive, nor particularly persuasive as to plaintiffs' right to recover. The test is, what was the undertaking or agreement in this particular which Mr. Lapointe and Mr. Hyde had, before either knew of the Sundstrand Company as a prospective purchaser, and was the undertaking accomplished?

It is true that Mr. Lapointe wanted to dispose of the stockholdings of himself and his wife in the American Company; and automatically the sale of the stock would result in a transfer of the business, at least *pro tanto*. The undisputed record is that Mr. Lapointe desired to dispose of his stock in order that he might be relieved of the burden and responsibility of active personal management of the American Company and be permitted to devote his time and energies to other activities. Prior to his agreement with Mr. Hyde in August of 1935, Mr. Lapointe had made previous efforts of a like character. For example, as hereinbefore noted, on a previous occasion through the activities of Mr. Hyde an attempt was made to negotiate a transaction with the Foster

Machine Company. The plan was reduced to writing and signed by the parties, including Mr. Lapointe. Notwithstanding the latter's contention that the contemplated transaction was not one for the sale or disposal of the American Company stock, we think the written agreement signed by Mr. Lapointe conclusively discloses the contrary. The agreement recites:

"Whereas, it is the desire of the first party (Foster Machine Company) to purchase *all the outstanding common capital stock* of the third party (American Company), now owned by the second party (Mr. Lapointe), * * *

"Now, therefore, * * * the first party agrees to purchase all of the outstanding common capital stock of the third party for and in consideration of the sum of $110,000 in cash (and other consideration)."

There can be little doubt, if any, that Mr. Lapointe knew of the character of Mr. Hyde's efforts to perform under his agreement of August, 1935, and of the type of the proposition he was submitting to various parties in an effort to find a purchaser. And surely Mr. Hyde's actions in this particular are something of an indication of the character and terms of his 1935 agreement with Mr. Lapointe. From time to time these two men discussed various prospective purchasers. Seven of Mr. Hyde's letters written to prospects are in evidence, and the record discloses that in substance these letters contain the statement that Mr. Hyde was offering for sale "all of the *capital stock* of a corporation whose developments in the line of broaching machines and broaching tools for all kinds of broaching operations is outstanding."

Mr. James O'Connor, a director and member of the executive committee of the Sundstrand Com-

pany, was a witness for defendants; and touching the phase of this litigation now under consideration he testified:

"Some time in that interval (before closing the deal) we reached the conclusion that we would take over the stock of the American Broach in exchange for the Sundstrand stock. * * *

"When the deal was closed, there was an exchange of Sundstrand stock for American Broach stock, but on this basis, that we had agreed to transfer Sundstrand stock to Mr. Lapointe and that immediately we would buy that stock, that McGowan, Cassidy and White would buy it, that he would get his cash money, and that's what occurred. * * *

"We have still got the two corporations. We didn't close out the American Broach. The Sundstrand Company owns the stock of the American Broach."

Even Mr. Lapointe gave testimony which is in accord with plaintiffs' claims that the transaction was a sale of stock, rather than a sale of a business. We quote briefly from Mr. Lapointe's testimony:

"The only difference between the original deal and the final deal was what Sundstrand wanted taken out, the real estate and those life insurance policies and other assets (of the American Company which were eliminated from the transaction by declaring a dividend out of its assets on December 23, 1935).

"*Q.* Now, in your direct examination, you talked a great deal about selling your business. Do you still make a distinction between the business and the total capital stock of the corporation which you finally sold?

"*A.* I make a distinction in what way?

"*Q.* Aren't they the same thing?

"*A.* Well, I'm not so sure. They may be and they may not. It depends. * * * The stock agreement

was arranged between Sundstrand Company and myself, the American Broach, whereby we were going to transfer the stock to them and take stock back from them, which I immediately cashed.  *  *  *  In order to consummate that deal, a stock transaction was put through whereby we transferred stock to them and took back stock from them."

We will note but one other of the numerous circumstances disclosed by this record which we think abundantly justifies the conclusion that Mr. Hyde's undertaking was the sale of the stock of the American Company rather than the sale of a business. There can be no question but that Mr. Hyde over a period of three months actively participated in the negotiations which led up to the transaction finally consummated by Mr. Lapointe and the Sundstrand Company. There is no claim that the character of this transaction changed so far as Mr. Lapointe is concerned pending the period of negotiations, aside from withdrawing certain assets of the American Company. It was finally consummated by a written agreement dated as of January 31, 1936. Surely this written agreement, in the framing of which Mr. Hyde had no part, should be persuasive of the nature of the transaction consummated. We quote the agreement in part:

"The stockholders (of the American Company) desire to exchange all the issued and outstanding *capital stock* of the American Company  *  *  *  for certain shares of the Sundstrand Company, and the Sundstrand Company desires that said exchange be accomplished, upon the terms and conditions hereinafter set forth.  *  *  *

"Subject to the terms and conditions of this agreement, the stockholders and Sundstrand Company agree to effect an exchange whereby the stockholders shall acquire from the Sundstrand Com-

pany, 29,145 shares of its capital stock, no par value, and the Sundstrand Company shall acquire from the stockholders *all the issued and outstanding capital stock of the American Company* and shall be given a lease and an option, as hereinafter mentioned.''

With such a record it would be difficult to escape the conclusion that throughout the negotiations Mr. Hyde's undertaking was to effect a sale of the American Company's stock. This was accomplished by an exchange for stock in the Sundstrand Company, which, with the exception of a limited number of shares retained by Mr. Lapointe, was immediately sold for cash, which was turned over to Mr. Lapointe in accordance with his agreement with the Sundstrand Company. This was the manner in which the transaction was finally consummated: All of the stock of the American Company was sold to the Sundstrand Company. The consideration was paid in cash, except for the shares of Sundstrand stock retained by Mr. Lapointe. And as to this stock, it may be noted that the record discloses its market value was then at least $14 per share but Mr. Lapointe obtained it at an agreed value of $10 per share. We must conclude that the sale was one of capital stock, not one of a business, and resulted in the performance of Mr. Hyde's undertaking.

We have considered other defenses urged, but in view of our conclusions above stated plaintiffs' right to recover is established and only brief notice herein of these other defenses is requisite. We are mindful of the defendants' contention and of the trial judge's holding that the transaction as finally closed with the Sundstrand Company was a different transaction than that which Mr. Hyde was commissioned to accomplish. In this particular it is noted that incident to closing the deal with the Sundstrand Company a contract was entered into with Mr. La-

pointe for his employment over a period of years; that rights under patents were involved, such rights being indispensable to conducting a broaching business; that after title to the American Company's real estate had vested in Mr. and Mrs. Lapointe as a result of a dividend declared by that company from its assets, a lease for a period of years was given to the American Company, and that this inured to the benefit of the Sundstrand Company when it purchased the stock of the American Company; and also, in closing the deal, the Sundstrand Company obtained an option to purchase the Ann Arbor real estate formerly owned and occupied by the American Company. But each of these transactions was complete in itself. With the possible exception of the option, each had its own consideration. Each was involved in the contemplated transaction while Mr. Hyde was still active in his negotiations in behalf of Mr. Lapointe. The mere fact that incidental to selling the stock of the American Company to the Sundstrand Company Mr. Lapointe saw fit also to consummate some other transactions does not bar the right of plaintiffs to recover a commission upon completion of the transaction undertaken by Mr. Hyde, *i. e.,* the sale of the stock of the American Company on terms agreeable to Mr. Lapointe. *McKinnon* v. *Gates,* 102 Mich. 618; *McGovern* v. *Bennett,* 146 Mich. 558; *Obenauer* v. *Solomon,* 151 Mich. 570; *West* v. *Newton,* 229 Mich. 68; *MacMillan* v. *C. & G. Cooper Co.,* 249 Mich. 594.

Concerning the contention that at the inception of this transaction it was contemplated that the sale should include the real estate of the American Company but that this result was not accomplished, it may be noted that Mr. Lapointe not only acquiesced in this change in the scope of this transaction but that he caused a dividend from the assets of the

American Company to be declared on December 23, 1935, while negotiations through Mr. Hyde with the Sundstrand Company were pending, and by so doing he took out of the assets of the American Company the fee title of its real estate and caused it to be vested in himself and his wife. Surely such a course of conduct on the part of Mr. Lapointe could not deprive his agent of a right to commissions because Mr. Lapointe's own conduct rendered impossible the completion of the transaction as originally contemplated. Nor is plaintiffs' right to recover affected by the fact that pending negotiations in the Sundstrand deal Mr. and Mrs. Lapointe created a trust whereby a portion of their stockholdings in the American Company was transferred in trust to their children, for whom Mr. and Mrs. Lapointe hold as trustees.

Appellees contend that since plaintiffs had no written agreement with or memorandum for payment of commission signed by Mr. Lapointe, they cannot recover because the transaction involved a sale of an interest in real estate. 3 Comp. Laws 1929, § 13417 (Stat. Ann. § 26.922). This contention is not tenable. There was no sale of an interest in real estate to the Sundstrand Company. *Hague* v. *DeLong*, 282 Mich. 330. An option to purchase before its acceptance is not an interest in real estate. *Windiate* v. *Leland*, 246 Mich. 659. The lease of the Ann Arbor real estate was between Mr. and Mrs. Lapointe as lessors and the American Company as lessee. The American Company still holds this lease. The only interest the Sundstrand Company has in the lease is as the holder of the stock of the American Company.

The remaining question for determination is the amount plaintiffs are entitled to recover. In so far as consideration for the Sundstrand sale went to Mr.

DeLong who held 8 of the 297 issued shares of the American Company's stock, plaintiffs are not entitled to recover commission. They had no contract with Mr. DeLong nor did Mr. Lapointe assume to represent Mr. DeLong in this transaction. Instead there was simply a tacit understanding that Mr. DeLong would turn his stock in on any deal satisfactory to Mr. Lapointe. But at the inception of this transaction the remaining 289 shares stood in the names of Mr. and Mrs. Lapointe, and his agreement with Mr. Hyde was for the sale of all of this stock for a commission of 10 per cent. of the amount received.

We note again that if there were any occasion for doing so, under the record in this case, we might well hold plaintiffs are entitled to recover against Mr. Lapointe on the basis of an implied contract to pay the reasonable value of the services rendered; and on this phase of the case plaintiffs offered uncontradicted testimony that reasonable compensation under the circumstances here disclosed would be 10 per cent. of the amount received. *Schurr* v. *Savigny,* 85 Mich. 144; *Nolan* v. *Swift,* 111 Mich. 56; *Middlebrook* v. *Slocum,* 152 Mich. 286; *Miller* v. *Stevens,* 224 Mich. 626.

This transaction with the Sundstrand Company was closed on the basis of an agreement between the parties that the net worth of the American Company's assets was $291,450, and the total issued stock of the American Company was purchased by the Sundstrand Company for that amount. In exchange for the issued stock of the American Company, the Sundstrand Company gave 29,145 shares of its capital stock, of no par value. But obviously the assumed or agreed value of the Sundstrand stock for the purpose of this transaction was $10 per share. In accordance with a provision constituting

a part of a final agreement between these parties, 25,945 shares of the Sundstrand stock were sold at $10 per share and the $259,450 received was paid to Mr. Lapointe and he received the remaining 3,200 shares of Sundstrand stock. There is testimony that the value of the Sundstrand stock at this time was considerably in excess of $10 per share. For this reason plaintiffs assert that their commission should be computed on the market value of the 3,200 shares. We are not in accord with this contention, because our conclusion from the record is that the agreement finally reached between Mr. Lapointe and the Sundstrand Company was for a sale of the American Company's stock on the basis of the amount of its assets as determined by an audit and appraisal, and that in this way the sale of the American Company's stock was fixed at the flat price of $291,450. The total number of outstanding shares of American stock was 297. At the inception of the transaction with plaintiffs, Mr. and Mrs. Lapointe owned 289 of these shares. Hence Mr. Lapointe's liability for commission is $289/297$ of 10 per cent. of $291,450. The result is $28,359.95.

The judgment entered in the circuit court should be reversed and the case remanded with directions to enter judgment in favor of plaintiffs and against defendant Francis J. Lapointe for $28,359.95 with interest thereon to be computed at the rate of 5 per cent. per annum from February 4, 1936. Plaintiffs should have costs of both courts against Francis J. Lapointe.

BUSHNELL, C. J., and WIEST and BUTZEL, JJ., concurred with NORTH, J.