Michigan Supreme Court
Lansing, Michigan 48909

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 18, 2003**

G.C. TIMMIS & COMPANY,

    Plaintiff-Appellant,

v                        No. 120035

GUARDIAN ALARM COMPANY,

    Defendant-Appellee.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

This case concerns whether plaintiff acted as a real estate broker under § 2501(d) of the real estate brokers act (REBA), MCL 339.2501 *et seq.* The trial court denied defendant's motion for summary disposition after finding that a question of fact remained concerning whether plaintiff participated in negotiations regarding the sale of a business. The Court of Appeals reversed the order of the trial court and

held that REBA required plaintiff to be a licensed real estate broker because it had acted as a "finder." We reverse the judgment of the Court of Appeals and remand this case to the trial court for a determination whether defendant's transaction here constituted a "real estate" transaction for purposes of REBA.[1]

## I. BACKGROUND

Plaintiff is a registered investment advisor, but it is not a licensed real estate broker. Plaintiff introduced itself to defendant, a security-systems company, in order to discuss how it might assist defendant in acquiring other security-systems companies. According to plaintiff, the parties entered into an oral contract, which specified that plaintiff would receive a "success fee" for any company plaintiff contacted on defendant's behalf that defendant subsequently purchased.[2] Plaintiff eventually introduced defendant to a company, MetroCell, a subsidiary of Rao Corporation. Subsequently, defendant purchased the alarm contracts of MetroCell and its customers, and plaintiff sought

---

[1] We deny plaintiff's motion to file a postargument supplemental brief regarding plaintiff's failure to submit at the time of oral argument a signed affidavit on defendant's motion for summary disposition in the trial court. However, we do not find this issue dispositive of this case in any way.

[2] Defendant disputes the existence of such an oral contract.

2

the "success fee." However, defendant refused to pay, claiming that REBA precluded plaintiff from bringing suit because plaintiff had acted as an unlicensed real estate broker. The trial court denied defendant's motion for summary disposition, concluding that there was a genuine issue of material fact regarding whether plaintiff had acted as a "real estate broker." The Court of Appeals, in a two-to-one decision, reversed. 247 Mich App 247; 635 NW2d 370 (2001). This Court granted plaintiff's application for leave to appeal.[3]

## II. STANDARD OF REVIEW

Statutory interpretation is an issue of law that is reviewed de novo. *People v Morey*, 461 Mich 325, 329; 603 NW2d 250 (1999).

## III. ANALYSIS

This Court must determine whether plaintiff's conduct fell within the scope of Michigan's real estate brokers licensing act. To determine whether plaintiff acted as a "real estate broker," this Court must first determine: (a) whether the Legislature intended the definition of "real estate broker" to encompass the brokerage of non-"real estate" transactions; and, if so, (b) whether plaintiff conducted itself as a "real estate broker," as defined in § 2501(d) of

_____

[3] 466 Mich 889 (2002).

3

the Occupational Code.  MCL 339.101 *et seq.*

### A.  REBA LIMITED TO REAL ESTATE TRANSACTIONS

MCL 339.2501(d) provides:

> "Real estate broker" means an individual . . . [or entity] who with the intent to collect or receive a fee, compensation, or valuable consideration, sells or offers for sale, buys or offers to buy, provides or offers to provide market analysis, lists or offers or attempts to list, or negotiates the purchase or sale or exchange or mortgage of real estate, or negotiates for the construction of a building on real estate; who leases or offers or rents or offers for rent real estate or the improvements on the real estate for others, as a whole or partial vocation; who engages in property management as a whole or partial vocation; *who sells or offers for sale, buys or offers to buy, leases or offers to lease, or negotiates the purchase or sale or exchange of a business, business opportunity, or the goodwill of an existing business for others*; or who, as owner or otherwise, engages in the sale of real estate as a principal vocation. [Emphasis added.]

When construing a statute, the Court's primary obligation is to ascertain the legislative intent that may be reasonably inferred from the words expressed in the statute. *Chandler v Co of Muskegon*, 467 Mich 315, 319; 652 NW2d 224 (2002).  If the language of the statute is unambiguous, the Legislature is presumed to have intended the meaning expressed.  *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996).

Real estate brokering is not the only profession regulated by the Legislature under the Occupational Code.  MCL

339.101 *et seq*. Rather, the Code regulates a number of other professions, including public accounting, barbering, hearing-aid dealing, and residential building. See MCL 339.720 *et seq*.; MCL 339.1101 *et seq*.; MCL 339.1301 *et seq*.; MCL 339.2401 *et seq*. A common theme prevails throughout each of these articles—namely, that each article deals with a single or discrete group of identified professions. For example, article 11 deals only with barbering and does not contain language that would suggest that it applies to any other professions, such as dog grooming.

The doctrine of *noscitur a sociis*, i.e., that "a word or phrase is given meaning by its context or setting," affords us assistance in interpreting § 2501(d). See *Koontz v Ameritech Services Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002). Thus, we utilize this doctrine, and apply this theme of a "single or discrete group of identified professions" in the Occupational Code to REBA. Because there is no reason to believe that in drafting REBA, the Legislature chose not to employ this "single or discrete group of identified professions" theme, we find this to be the first indication that REBA applies only to the brokering of real estate.

However, our inquiry does not stop there. Next, we apply noscitur a sociis to the individual phrases of § 2501(d), as well as to the other provisions of REBA because the emphasized

5

language does not stand alone, and thus it cannot be read in a vacuum. Instead, "[i]t exists and must be read in context with the entire act, and the words and phrases used there must be assigned such meanings as are in harmony with the whole of the statute . . . ." *Arrowhead Dev Co v Livingston Co Rd Comm,* 413 Mich 505, 516; 322 NW2d 702 (1982). "[W]ords in a statute should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the act as a whole." *Gen Motors Corp v Erves (On Rehearing)*, 399 Mich 241, 255; 249 NW2d 41 (1976)(opinion by Coleman, J.). Although a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context. *McCarthy v Bronson*, 500 US 136, 139; 111 S Ct 1737; 114 L Ed 2d 194 (1991); *Hagen v Dep't of Ed*, 431 Mich 118, 130-131; 427 NW2d 879 (1988). "In seeking meaning, words and clauses will not be divorced from those which precede and those which follow." *People v Vasquez*, 465 Mich 83, 89; 631 NW2d 711 (2001), quoting *Sanchick v State Bd of Optometry*, 342 Mich 555, 559; 70 NW2d 757 (1955). "It is a familiar principle of statutory construction that words grouped in a list should be given related meaning." *Third Nat'l Bank in Nashville v Impac Ltd, Inc*, 432 US 312, 322; 97 S Ct 2307; 53 L Ed 2d 368 (1977); see also *Beecham v United States*, 511 US 368, 371; 114 S Ct 1669; 128 L Ed 2d 383

6

(1994).

The emphasized language of REBA's definition of "real estate broker," part IIIA above, includes the phrase, one "who . . . negotiates the purchase or sale . . . of a business, business opportunity, or the goodwill of an existing business for others . . . ." MCL 339.2501(d). In interpreting this language, we examine its context and must give it a meaning that is not only logically related to the type of broker specifically defined in § 2501(d), but also a meaning logically related to the other five phrases used in § 2501(d) to define a "real estate broker," and the other provisions of REBA. *Vasquez, supra* at 89.

Section 2501(d) defines not merely a broker, but specifically a "real estate" broker, and thus provides the first indication that the Legislature intended that REBA apply only to persons brokering real estate. Further, immediately following REBA's definition of "real estate" broker, the Legislature defines "real estate" salesperson, in terms that expressly cross-reference the definition of "real estate" broker, i.e., a "real estate salesperson" is one who is employed by a "real estate broker." The Legislature also defines five other terms in § 2501,[4] all of which are defined

[4] "Property management," "property management account," "property management employment contract," "employment," and
(continued...)

7

by express reference to "real estate" or "real property." The Legislature then employs six definitional phrases in § 2501(d) to give meaning to the term "real estate broker," and each of those phrases, with the exception of the one at issue, either expressly uses or references the term "real estate."[5] The Legislature proceeds to employ these same definitional phrases in giving meaning to "real estate salesperson."

Moreover, there are other textual indicators that REBA applies only to "real estate." First, the courses an applicant must complete in order to receive a license under this act, a license as a "real estate" broker, all not surprisingly concern real estate.[6] Second, amid this focus on real estate, there is nothing within REBA that suggests any legislative intent that it apply to non-"real estate"

---

[4](...continued)
"independent contractor relationship." MCL 339.2501(a)-(c),(f), and (g).

[5] Section 2501(d) defines a "real estate broker" as one who, for a fee, "sells . . . or buys . . . real estate"; "rents . . . real estate"; "leases . . . real estate"; or "who otherwise engages in the sale of real estate." A 1994 amendment of REBA expanded the definition of "real estate broker" to include one who "engages in property management," defined in MCL 339.2501(a) as "the leasing or renting . . . of real property . . . ."

[6] MCL 339.2504(3). For example, these courses include: (1) real estate licensing law and related regulatory laws; (2) real property law; (3) conveyances, including contracts, deeds and leases; (4) appraisal of real property; and (5) real estate securities and syndications.

8

transactions.[7]  Thus, application of the "single or discrete group of identified professions" theme, along with an examination of the text of § 2501(d), as well as the text of REBA's surrounding provisions, together suggest that REBA's licensing requirement only applies to "the purchase or sale . . . of a business, business opportunity, or the goodwill of an existing business"[8] when that purchase or sale involves a

---

[7] For example, MCL 339.2502 creates the board of *real estate* brokers; MCL 339.2504 mandates continuing education requirements of *real estate* brokers; MCL 339.2505 provides the licensing requirements of *real estate* brokers; MCL 339.2506 states the method by which a *real estate* salesperson's license is issued; MCL 339.2507 mandates that a *real estate* salesperson's license be returned by the *real estate* broker department upon termination of employment; MCL 339.2508 defines the scope of a *real estate* broker's license; MCL 339.2509 provides for the issuance of associate *real estate* broker's licenses; MCL 339.2510 sets forth the commissions to which a *real estate* salesperson is lawfully entitled; MCL 339.2512b provides that referral of prospective tenants does not constitute participation in a *real estate* transaction; and MCL 339.2514 states that nonresidents can become *real estate* brokers.

[8] Purchase of "*the premises* in which [the] business is conducted" is one way to acquire "goodwill."  Black's Law Dictionary (6th ed)(emphasis added).  In our judgment, because goodwill can be acquired merely through a business's premises, i.e., real estate, and because the surrounding text and provisions of REBA relate only to real estate, we find that the "goodwill" language of § 2501(d) applies only to situations in which the purchase or sale of an existing business's goodwill is made in conjunction with the purchase or sale of the premises in which that goodwill was acquired.  We believe that such language was inserted in § 2501(d) to prohibit an unlicensed broker from contending: (1) that it can be compensated for that portion of a real estate transaction that involves non-"real estate," including the purchase or sale of the existing business's goodwill, or (2) that it can be
(continued...)

9

real estate transaction.

The purpose of REBA, which is to protect the integrity of real estate transactions by ensuring that they are brokered by persons expert in that realm, requires the interpretation that REBA applies only to real estate transactions. The conclusion that the emphasized language of § 2501(d) applies only to real estate transactions affords reasonable meaning to this language within the context of the provisions that surround it, while maintaining the focus of REBA on transactions involving the purchase or sale of business real estate.

Alarm contracts are not real estate and, thus, at least on the basis of the present record, REBA is not applicable to this transaction, which apparently involved only the purchase of such contracts. However, because our interpretation of § 2501(d) has not been previously set forth, and because this case was resolved on summary disposition where the record may not have been fully developed in light of this interpretation,

---

[8](...continued)
compensated for the entire transaction because the purchase or sale of the business's real estate was incidental to the purchase or sale of the existing business's goodwill. Moreover, the meaning we accord "goodwill" as it is used in REBA is not, as the dissent asserts, "patently false and taken out of context," *post* at 7 n 3, because, as set forth in its dictionary definition, goodwill *can* be acquired, among other ways, through the "premises in which the business is conducted."

10

we remand this matter to the trial court for a determination of whether a real estate transaction was involved here.

B.   "REAL ESTATE BROKER"

If, on remand, the trial court determines that defendant's purchase of MetroCell's contracts involved a real estate transaction, the trial court must then address a further issue: whether plaintiff is prohibited by MCL 339.2512a from seeking compensation for its services because plaintiff was not a licensed "real estate broker."  MCL 339.2501(d).

As previously stated, § 2501(d) defines a "real estate broker" as an individual or entity that "sells . . . buys . . . or negotiates the purchase or sale . . . of a business, business opportunity, or the goodwill of an existing business for others. . . ."  MCL 339.2512a provides:

> A person engaged in the business of, or acting in the capacity of, a person required to be licensed under this article, shall not maintain an action in a court of this state for the collection of compensation for the performance of an act or contract for which a license is required by this article without alleging and proving that the person was licensed under this article at the time of the performance of the act or contract.

The Court of Appeals held that "plaintiff's activities constituted 'negotiations [for] the purchase or sale or exchange of a business' as contemplated by the act and that, therefore, [plaintiff] was required to procure a real estate

11

brokers license in order to collect fees for its service."
247 Mich App 252-253. In reaching this conclusion, the
appellate court relied on *Cardillo v Canusa Extrusion
Engineering Inc,* 145 Mich App 361; 377 NW2d 412 (1985),
observing:

> Here, plaintiff found business assets for
> defendant to purchase, conduct which falls squarely
> within the definition of activities performed by a
> "real estate broker" under the act. . . . [I]t is
> clear that plaintiff's conduct in attempting to
> locate business assets for purchase by defendant
> constitutes action of a "real estate broker" as
> defined by the statute. [247 Mich App 256-257.]

In *Cardillo*, the plaintiffs alleged that the defendant
orally agreed to pay a fee for successfully finding a buyer
for the defendant's engineering firm. The defendant moved for
summary disposition, contending that REBA precluded the
plaintiffs from bringing an action seeking compensation
because the plaintiffs were unlicensed as real estate brokers.
*Cardillo, supra* at 364-365. Although the plaintiffs claimed
not to be brokers, the Court of Appeals opined:

> In interpreting this statute, the trial court
> concluded that a mere finder or middleman is not
> included in the definition of a broker. We do not
> agree. . . . Sometimes, performing one of the *usual
> functions*, such as finding a purchaser, will be
> enough to subject a person to the broker licensing
> requirement.
>
> * * *
>
> Under this analysis [after reviewing REBA], we
> would hold that in finding a purchaser for
> defendants' assets under a commission agreement,
> plaintiffs were subjected to [REBA]. [*Id.* at 368,

12

371 (emphasis added).]

Thus, under *Cardillo*, one must be a licensed real estate broker when one merely performs one of the "usual functions" of a real estate broker, including among other things "finding" a purchaser for real estate.

However, in our judgment, REBA does not require one to be a licensed real estate broker when one merely performs a "usual function" of a real estate broker, such as "finding" a purchaser. Rather, REBA expressly requires that one be a licensed real estate broker only if, for a fee, one "sells or buys" real estate or "negotiates" a real estate transaction for another. MCL 339.2501(d). Accordingly, to the extent that *Cardillo* holds otherwise, we believe that it reads too much into § 2501(d), and, thus, we reject its interpretation of this provision.

In rejecting *Cardillo*'s interpretation of § 2501(d), we instead believe that *Turner Holdings, Inc v Howard Miller Clock Co*, 657 F Supp 1370 (WD Mich, 1987), correctly interpreted this provision. In that case, the court held that one need not possess a real estate broker's license for merely "identifying and advising" a client about a purchase of a business.[9] Likewise, unless plaintiff's actions here are

_____

[9] In the present case, the Court of Appeals refused to follow *Turner Holdings* because "decisions of a federal
(continued...)

13

covered by § 2501(d)—that is, unless plaintiff's activities can reasonably be characterized as "sell[ing], . . . buy[ing], . . . or negotiat[ing]" the purchase or sale of real estate for another for a fee, it is not required to possess a real estate license.

Although, in our judgment, *Cardillo*'s interpretation of REBA is incorrect, we agree with Judge WHITE in her dissent in the instant case,[10] and would also remand to the trial court for consideration of whether plaintiff, in fact, "negotiated" a real estate transaction with MetroCell (or its parent Rao Corporation). There is a genuine issue of material fact

---

[9](...continued)
district court interpreting Michigan law are not binding precedent on Michigan courts . . . [and] [w]e further decline to extend the reasoning of *Turner Holdings* to the present case, and reaffirm the *Cardillo* Court's interpretation and application of the statute as correct." 247 Mich App 258. Of course, we agree that federal decisions interpreting Michigan law are not binding on Michigan courts, but we do find *Turner Holdings* nonetheless to be persuasive.

[10] In her dissent, Judge WHITE stated:

Taken in the light most favorable to plaintiff, there is a genuine issue whether plaintiff seeks compensation for the performance of an act . . . for which a license is required by the statute. Plaintiff does not claim compensation for offering to buy MetroCell or for any negotiating respecting the sale. Rather, plaintiff seeks compensation for providing information concerning the nature of the industry, the approach defendant should take to strengthen its position in the industry, and the type of business it should attempt to acquire, and for targeting MetroCell as such a business. [247 Mich App 261.]

14

relating to whether plaintiff participated in real estate negotiations. For example, defendant offered the following evidence of plaintiff's participation in real estate negotiations: (a) that plaintiff's lawyer sent defendant a letter, acknowledging that it "represented [defendant] in negotiations with Rao Corporation for the purchase of MetroCell Security over a period of several weeks"; (b) that plaintiff's business brochure stated that plaintiff often engaged in transactions requiring it to perform "acquisition negotiations"; and (c) that plaintiff had meetings with Rao Corporation to engage in business "discussions" of some uncertain character. However, plaintiff presented the following evidence in response: (a) that plaintiff only introduced itself to defendant as an investment banker; (b) that the alleged oral contract between plaintiff and defendant never mentioned negotiations; (c) that the purpose of plaintiff's initial meeting with Rao Corporation was merely to determine whether MetroCell was for sale; and (d) that the only evidence regarding negotiations are those that occurred between defendant and MetroCell, not between plaintiff and MetroCell. Therefore, if, on remand, the trial court determines that a real estate transaction occurred here, the trial court must then determine also whether plaintiff "negotiated" such transaction.

The dissent criticizes the majority's interpretation of § 2501(d) by asserting that we  "ignore[] the clear language of the REBA" and "sidestep[] the plain meaning of the words . . . ."  *Post* at 1, 6.  We respectfully, but strongly, disagree.  Although we may reach a different conclusion than the dissent, we do not "ignore" the language of the statute.[11] Rather, our conclusion that the real estate brokers act is limited to transactions involving real estate is predicated on the following analysis: (1) that § 2501(d) defines a specific type of broker, a "real estate" broker; (2) that the Legislature defines other occupations in this provision, all of which expressly cross-reference "real estate" broker; (3) that the Legislature defines five other terms in § 2501, all of which are defined by express reference to "real estate" and "real property"; (4) that five of the six definitional phrases used by the Legislature in § 2501(d) either expressly use or reference the term "real estate"; (5) that the Legislature then proceeds to employ these same definitional phrases in giving meaning to "real estate salesperson"; (6) that all the

---

[11]  Nor have we rejected the dissent's interpretation of the statute in order to avoid the "enforcement of a policy [that we] reject as unsound."  *Post* at 11.  Rather, the majority has taken no position on the "soundness" of a broader or narrower REBA and, instead, has rejected the dissent's interpretation entirely on its own merits.

16

courses that a person is required by the statute to complete to become a "real estate broker" concern real estate; and (7) that other sections of REBA *only* discuss "real estate" and "real estate brokers."  Thus, it is only on the basis of its language that we reach our conclusions concerning the meaning of REBA.[12]

---

[12] Moreover, we disagree with the dissent that the interpretative doctrine of *noscitur a sociis* cannot "properly" be applied in the instant context because the language being defined in § 2501(d) has only a single  "customary meaning." *Post* at 10-11.  We disagree, and we believe that the dissent's "pig" hypothetical example makes our point.  Concerning this hypothetical example, *noscitur a sociis* can not only be "accurately" applied, but must necessarily be applied.  Contrary to the dissent's assertion, the term "pig" does not have a single, invariable meaning.  Rather, it has several separate and distinct meanings, including: (1) a swine; (2) a person who is gluttonous, greedy, or slovenly; or (3) an oblong mass of metal that has been run into a mold of sand while still molten.  *Random House Webster's College Dictionary* (2d ed).  Further, "pig" may also be defined as: (4) a segment of a citrus fruit or an apple; (5) a device that fits within an oil or gas pipeline to clean or inspect its insides; or (6) an earthenware pitcher, jar or other vessel.  *New Shorter Oxford English Dictionary (*4th ed*)*.  That the first of these definitions would suggest itself to a "native speaker of English as the common, most likely meaning of the term," *post* at 10, n 5, is surely a correct, but an irrelevant, observation on the part of the dissent.  We do not accord words "default" definitions on the basis of their order of appearance in the dictionary.  Rather, because the term "pig" has several different meanings, we initially apply *noscitur a sociis (*whether or not in an explicit fashion) to accord it one of these meanings-that which is contextually related to the language that surrounds "pig."  Such a meaning, we assume, is that which is most likely intended by the lawmaker.  In the dissent's hypothetical example, after examining the immediately surrounding terms, all of which have in common that they relate to animals, we accord "pig" its only meaning possessed in common with these other terms, i.e., "a swine."

(continued...)

Next, the dissent contends that the majority's interpretation that REBA applies only to transactions involving real estate is in error because it "ignores the historical evolution of the statute," which evidences the legislative intent that REBA "encompasses the brokerage of business opportunities that do not involve real estate transactions." *Post* at 8, 13. However, because the meaning of § 2501(d) can be reasonably ascertained, in our judgment, by examining its language, including the context of this language, and therefore is not ambiguous, there is no need to resort to the legislative history of the act to assist in our interpretation. Nonetheless, to the extent that this history is examined, we believe that it is consistent with our interpretation of REBA.

In 1919, the Legislature enacted the brokers license act, 1919 PA 306, which was titled, "An act to define, regulate, and license real estate brokers, real estate salesmen and

---

[12](...continued)
Moreover, our analysis would not necessarily stop there. Instead, depending on the matter in controversy, *noscitur a sociis* might have to be further applied to determine an even narrower common characteristic between "a swine" and the other listed terms, for example, that each of these terms can be characterized as an animal that is a mammal. Similarly, we believe that the instant phrase is susceptible to different meanings, at least until *noscitur a sociis* refocuses our interpretative gaze from the phrase itself to the words and phrases that surround it.

18

business chance brokers and to provide a penalty for a violation of the provisions hereof." Section 2 of that act defined "business chance broker" as "any person, firm, partnership association, copartnership or corporation, who for compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of a business, business opportunity, or the good will of an existing business for others as a whole or partial vocation." On the basis of this definition, this Court found in *Hague v Delong*, 292 Mich 262; 290 NW 403 (1940), that a person must be a licensed real estate broker even though a transaction does not involve real estate. Subsequently, in 1943, the Legislature eliminated this separate provision concerning "business chance brokers" and expanded the definition of "real estate broker" to include the activities previously assigned to a business chance broker.

While we agree with the dissent concerning the facts of this history, we do not agree about its significance. While the dissent views the 1943 amendments as evidencing the Legislature's intent that the broad definition of "business chance broker," as defined in *Hague,* be fully retained as part of REBA's modified definition of "real estate broker," we view this differently. Rather, the Legislature can just as easily be viewed as having transferred a phrase, originally defining

19

a broad term ("business chance brokers") occurring within a broad act (encompassing both "real estate" and "business chance" brokers), and reincorporated this phrase within the definition of a more narrow term ("real estate broker") occurring within a more narrow act (encompassing only "real estate" brokers).  Not only does the term itself that is being defined (here, "real estate broker," rather than "business chance broker") afford some textual clue about its own definition, see discussion at 8, but the different statutory contexts within which the term is located (here, a statute confined to real estate brokers, rather than one encompassing both real estate and business chance brokers) affords some textual clue about its meaning.  We do not believe that a given grouping of words—in this case "business, business opportunity or good will of an existing business"—has an invariable meaning regardless of what it purports to be defining, regardless of the words and phrases that surround it, regardless of the organization of the statute in which it is contained, and regardless of the overall purposes of this statute.

Moreover, we believe that it is necessary to ask why the Legislature in 1943 would have undertaken this apparently substantial rewrite of REBA—modifying its title, and amending the statute in accordance with this title modification by

eliminating coverage for "business chance brokers," and limiting the statute's coverage to "real estate brokers"–if it had intended that there be no change whatsoever in the scope of the act's coverage. By itself, the decision to *alter* the statute suggests some intent to effect a substantive change in the statute. Further, consider that this alteration of the statute occurred against the backdrop of a decision of this Court finding that the 1919 act was clear and encompassed transactions involving the sale of *all* businesses, real estate or otherwise.

For these reasons, we cannot join the dissent in concluding that the Legislature intended that "real estate broker" within REBA be understood to mean "broker," or "a broker of all things, real estate or otherwise."

## V. Conclusion

REBA applies only to real estate transactions. Further, under § 2501(d), one must only be a licensed real estate broker when, for a fee, one "sells or buys" real estate or "negotiates" a real estate transaction for another.

For these reasons, we reverse the judgment of the Court of Appeals and remand this case to the trial court for a determination of whether a real estate transaction occurred here. If no such transaction occurred, the trial court must merely determine whether an oral contract existed between

21

plaintiff and defendant and compensate plaintiff accordingly.

However, if the trial court determines that a real estate transaction occurred, then, consistently with the language of § 2501(d) and this opinion, the trial court must also determine whether plaintiff's actions constituted those of a "real estate broker" and proceed accordingly.

Stephen J. Markman
Maura D. Corrigan
Michael F. Cavanagh
Marilyn Kelly
Clifford W. Taylor

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

G.C. TIMMIS & COMPANY,

    Plaintiff-Appellant,

v                                                                No.  120035

GUARDIAN ALARM COMPANY,

    Defendant-Appellee.

_____

YOUNG, J. (*dissenting*).

    The majority ignores the clear language of the REBA, MCL 339.2501 *et seq.*, favoring instead an interpretation whose result the majority deems more palatable.  The majority also ignores the historical evolution of the statute, which is not dispositive but is entirely consistent with the unambiguous language of the statute.  I believe that the statute encompasses the brokerage of business opportunities that do not involve real estate transactions.  Accordingly, I would affirm the decision of the Court of Appeals.  Because the majority concludes otherwise, I respectfully dissent.

    Plaintiff maintains that transaction it allegedly contracted to perform, which did not involve real estate, is not covered by the REBA and thus plaintiff was not required to

be licensed under that act as a precondition of bringing suit for breach of the alleged agreement.  The majority contends that the issue in this case is whether the Legislature "intended" the definition of real estate broker to encompass the brokerage of non-real estate transactions.  *Ante* at 3.  However, rather than seeking to divine a free floating legislative intent, I believe that the Court's task in this case is to determine whether the words *actually used* by the Legislature encompass the brokerage of business opportunities that do not involve real estate.

Our obligation of giving effect to the intent of the Legislature begins by examining the language of a statute.  The words of a statute provide the most reliable evidence of legislative intent.  *Coleman v Gurwin*, 443 Mich 59, 65; 503 NW2d 435 (1993).  If the language of the statute is clear, the Legislature must have intended the meaning expressed, and the statute is enforced as written.  *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995).  It is only in the face of an ambiguity that a court may properly look outside the words utilized in the statute to ascertain legislative intent.  *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999).  Finally, in construing a statute, we must give the words used by the Legislature their common, ordinary meaning.

MCL 8.3a.[1]

Over the past several years, a majority of this Court has consistently adhered to the philosophy that the plain language of a statute should be applied without regard to the "legislative wisdom" of the outcome. This philosophy is grounded in the belief that separation of powers principles preclude the judiciary from engaging in judicial legislation or otherwise "saving" the citizenry from the actions of its duly elected legislators. See *People v Borchard-Ruhland*; 460 Mich 278; 597 NW2d 1 (1999); *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999); *Perez v Keeler Brass Co,* 461 Mich 602; 608 NW2d 45 (2000); *People v Hermiz*, 462 Mich 71; 611 NW2d 783 (2000); *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000); *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143; 615 NW2d 702 (2000); *People v Glass*, 464 Mich 266; 627 NW2d 261 (2001); *Michigan United Conservation Clubs v Secretary of State*, 464 Mich 359; 630 NW2d 297 (2001); *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002); *Robertson v DaimlerChrysler Corp*, 465 Mich 732; 641 NW2d 567 (2002);

---

[1] Indeed, the statutory construction rules, MCL 8.3 *et seq.*, provide a compelling justification, if any were needed, for hewing closely to the common meaning of the words employed in a statute: The Legislature is drafting its statutes in reliance that courts will follow the statutory canons of construction the Legislature has adopted.

*People v Cornell*, 466 Mich 335; 646 NW2d 127 (2002); *Sington v Chrysler Corp*, 467 Mich 144; 648 NW2d 624 (2002); *Mack v Detroit*, 467 Mich 186; 649 NW2d 47 (2002); *Weakland v Toledo Engineering Co, Inc*, 467 Mich 344; 656 NW2d 175 (2003); *In re Certified Question (Kenneth Henes Special Projects Procurement v Continental Biomass Industries, Inc),* 468 Mich 109; 659 NW2d 597 (2003). I do not believe that the majority's opinion can be easily squared with the principles of statutory construction outlined in the previously cited cases.

### A. The Clear Language of the Statute is not Limited to Real Estate Transactions

The statute at issue is contained in the Occupational Code. MCL 339.2501(d) defines "real estate broker" as follows:

> "Real estate broker" means an individual, sole proprietorship, partnership, association, corporation, common law trust, or a combination of those entities who with intent to collect or receive a fee, compensation, or valuable consideration, sells or offers for sale, buys or offers to buy, provides or offers to provide market analyses, lists or offers or attempts to list, or negotiates the purchase or sale or exchange or mortgage of real estate, or negotiates for the construction of a building on real estate; who leases or offers or rents or offers for rent real estate or the improvements on the real estate for others, as a whole or partial vocation; who engages in property management as a whole or partial vocation; *who sells or offers for sale, buys or offers to buy, leases or offers to lease, or negotiates the purchase or sale or exchange of a business, business opportunity, or the goodwill of an existing business for others*; or who, as owner

4

or otherwise, engages in the sale of real estate as a principal vocation. [Emphasis added.]

The plain language of the statute defines a real estate broker as, among other things, one who "negotiates the purchase . . . of a business, business opportunity, or the goodwill of an existing business for others . . . ." There is no textual indication in the statute that brokering a "business," "business opportunity," or the "goodwill of an existing business" is limited to only those transactions involving real estate. To the contrary, the clear language of "business, business opportunity, or the goodwill of an existing business" encompasses the brokerage of transactions without regard to real estate. The majority does not discuss the plain meaning of the statutory language; rather, the majority's analysis sidesteps the plain meaning of the words and proceeds directly to the use of a canon of statutory construction and other contextual tools to explain why the plain language *could not possibly* mean what it so obviously says.

In fact, by its very definition, the term "goodwill" refutes any notion that real estate is the factor common to all the actions assigned to real estate brokers by the Legislature. Goodwill is an intangible asset defined as "[t]he favor which the management of a business wins from the public" and "[t]he fixed and favorable consideration of customers arising from established and well-conducted

5

business." Black's Law Dictionary (5th ed).[2] Thus, contrary to the majority's assertions, goodwill has *nothing to do* with real estate; rather, it attaches *only* to an ongoing business concern.[3] The irreducible problem faced by the majority is

---

[2] See also *Random House Webster's College Dictionary* (2002), which defines goodwill as "an intangible, salable asset arising from the reputation of a business and its relations with its customers."

[3] The majority's quotation of Black's Law Dictionary, wherein the majority states that "[p]urchase of 'the premises in which the business is conducted' is one way to acquire goodwill" is patently false and taken out of context. Ante at 9 n 8.

Read in its entirety, the passage states:

> The custom of patronage of any established trade or business; the benefit or advantage of having established a business and secured its patronage by the public. *And as property incident to business sold*, favor vendor has won from public, and probability that all customers will continue that patronage. It means every positive advantage that has been acquired by a proprietor in carrying on his business, whether connected with the premises in which the business is conducted, or with the name under which it is managed, or with any other matter carrying with it the benefit of the business. [Black's Law Dictionary (6th ed)(emphasis added).]

Thus, when an ongoing business *and* its physical assets are purchased, goodwill comes with it. However, purchase of the premises *alone* does not convey goodwill. Similarly, the purchase of only the ongoing business without its physical assets will convey goodwill.

The majority is compelled to ignore the fact that goodwill is never associated with anything other than the value of the *continued patronage of an ongoing business*
(continued...)

6

that it cannot fit this round peg into its square hole.  That
is, the majority cannot declare the term "goodwill" to mean
"real estate" without completely emasculating the definition
of "goodwill."  The majority makes a conscientious effort to
ignore the fact that the word "goodwill" is a legal term of
art that is distinct from real estate or any other physical
asset.

B. Misuse of Statutory Construction Canons

Of importance, I believe that the majority misuses canons
of statutory construction to actually *deprive* the words of the
statute their customary meaning.[4]  This is contrary to the
well-understood principle that statutory construction aids
should not be utilized to *create* an ambiguity where one does

---

[3](...continued)
*concern* in order to advance its argument that the REBA concerns
only real estate transactions. See *Pontiac Trust Co v Newell*,
266 Mich 490, 501; 254 NW 178 (1934)("[G]oodwill cannot exist
without a going concern . . . .").

[4] In addition to misconstruing canons of statutory
construction, the majority also invents new ones.  After
noting that each article in the Occupational Code "deals with
a single or discrete group of identified professions," the
majority proceeds to utilize and quote the "'single or
discrete group of identified professions' theme" as a divining
rod for legislative intent.  *Ante* at 5-6 and 9. This method
appears to be an application of a variant of the principle of
*in pari materia*, not *noscitur a sociis*, which is properly used
only where an ambiguity exists. *Tyler v Livonia Pub Schools*,
459 Mich 382, 390, 392; 590 NW2d 560 (1999).  It appears
obvious that the majority is willing to ignore distinctions
between interpretive canons in order to arrive at its
preferred construction of REBA.

7

not otherwise exist.  See *In re Certified Question (Henes v Continental Biomass), supra*.  Under the doctrine of *noscitur a sociis*, "the meaning of *questionable* words and phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it."  Black's Law Dictionary (5th ed) (emphasis added).  United States Supreme Court Justice Antonin Scalia discussed the meaning of this rule by illustration: "If you tell me, 'I took the boat out on the bay,' I understand 'bay' to mean one thing; if you tell me, 'I put the saddle on the bay,' I understand it to mean something else."  *A Matter of Interpretation*, (Princeton, New Jersey: Princeton University Press, 1997), p 26.  Using Justice Scalia's example as a guide, it is clear that the common meaning of the terms "business, business opportunity, or the goodwill of an existing business" are not contextually altered by the rest of the language in the REBA.

I offer the following as an example to illustrate the majority's abuse and misapplication of this canon of statutory construction.  Suppose that a hypothetical statute were to preclude ownership of the following animals without a license:

Duck, Goose, Bittern, Swan, Heron

Presume that the word "bittern" had no commonly understood meaning that could be discerned by resort to a dictionary.  In order to determine the meaning of the word, the doctrine of

8

*noscitur a sociis* could be utilized to reasonably come to the conclusion that a bittern is a type of waterfowl.  That is, where the meaning of the word is not apparent, the meaning could be ascertained by reference to the meaning of words associated with it.

Now suppose that the hypothetical example were altered slightly, and the statute listed these animals:

Duck, Goose, Pig, Swan, Heron

Unlike bittern, the word "pig" does have a fixed, commonly understood meaning, and it is *not* "waterfowl."[5]  However, under the majority's analysis, the doctrine of *noscitur a sociis* could properly be used to come to the conclusion that a pig is a waterfowl (despite the clear, unambiguous meaning of pig), because all the surrounding terms were waterfowls.[6]

---

[5] We agree with the majority that "pig" does have many meanings beyond swine.  *Ante* at 18 n 12.  However, none of the alternatives cited in the majority opinion, such as an "oblong mass of metal," would suggest themselves to a native speaker of English as the common, most likely meaning of the term as used in our hypothetical statute.

[6] The majority uses *noscitur a sociis* to suggest, not that the correct definition of "pig" is a swine, but that the level of abstraction should move from "waterfowl and swine" to animals or mammals.  The majority must do so because it desires to give no meaning (at least not the meaning every other person familiar with these terms would give them) to the REBA terms that originally constituted the business chance broker statute.  Surely, the majority's approach is unlimited by any common sense.  Thus, using the majority's method, we could abstract the meaning to the point that we could characterize the terms in our hypothetical statute as meaning
(continued...)

Similarly, despite the clear and unambiguous meaning of "business, business opportunity, or the goodwill of an existing business," the majority concludes that these words are limited to those involving "a real estate transaction." *Ante* at 10. By misuse of the rules of construction, I believe the majority is amending the statute in order to avoid giving meaning to the words the Legislature has employed because to do so would result in the enforcement of a *policy* the majority rejects as unsound. The doctrinal difference separating me from the majority is that I am satisfied with applying the plain meaning of the statutory words, whereas the majority is uncomfortable with a construction that results in licensed real estate brokers being the only persons in Michigan authorized to buy and sell businesses for others for a fee. This is an admittedly odd result, but one of the Legislature's making. As my colleague Justice TAYLOR has observed elsewhere,

---

[6](...continued)
"English words" or "nouns." The majority must make such an abstraction because giving the equivalents of "pig" in REBA their obvious meaning results in a construction the majority does not like. The majority fails to explain why it is appropriate, given goodwill's definite meaning as a term of art (which is completely divorced from the term "real estate"), to "abstract" the term in the manner it does. The action taken by the majority is actually a redefinition, not an abstraction. Moreover, it is also unclear what principle, if any, the majority employs to discern the appropriate level of "abstraction" to be used in any given application of its new rule of construction. This is no longer a principle of statutory construction. It is a rule of deconstruction.

10

I "take comfort in the fact that the Legislature is free to amend" this statute if it now considers that the statute no longer reflects a sound policy choice. *People v Hermiz*, *supra* at 80 n 13.  I fully agree with the proposition that "the Legislature should not have to suffer judicial interference with the choice made in its legislative product."  *Id.* at 81. Thus, in my view, it remains the duty of the Legislature, not this Court, to change the state's licensing policy.

C. The Historical Import of the Statutory Phrase

In addition to ignoring the most obvious, common meaning of the disputed statutory provisions, which as the primary consideration, resolves the question before the Court, the majority ignores the historical evolution of the statute and the distinct meaning given to the "business chance broker" provisions.  While this history is by no means dispositive, REBA's text being the most compelling basis for determining the intent of that statute, it does provide additional comfort that the construction I offer is sound.

In 1919, the Legislature enacted the brokers license act, 1919 PA 306, which was titled "An act to define, regulate, and license real estate brokers, real estate salesmen and business chance brokers and to provide a penalty for a violation of the provisions [of the act]."

Section 2 of the brokers license act defined "business

11

chance broker," and provided in pertinent part:

> A business chance broker within the meaning of this act is any person, firm, partnership association, copartnership or corporation, *who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of a business, business opportunity, or the good will of an existing business for others as a whole or partial vocation.* [1919 PA 306 (emphasis added).[7]]

In 1943, the "business chance broker" section was eliminated, and the provisions delineating the responsibilities of business chance brokers were transferred *verbatim* to the real estate broker licensing act. Thus, the statutory definition of real estate broker was expanded to include those activities previously assigned to business chance brokers. The formerly separate business chance broker provision incorporated into the real estate broker provision is highlighted below:

> A real estate broker within the meaning of this act is any person, firm, partnership association, copartnership or corporation, who with intent to collect or receive a fee, compensation or valuable consideration, sells or offers for sale, buys or offers to buy, appraises or offers to appraise, lists or offers or attempts to list, or negotiates the purchase or sale or exchange or mortgage of real estate, or negotiates for the construction of buildings thereon, or who leases or

---

[7] In 1937, a provision was added to § 3 of the act, stating that "[t]he commission of a single act prohibited under the Michigan statutes defining, regulating and licensing real estate brokers and salesmen shall constitute a violation thereof." 1937 PA 188. Under that amendment, even isolated transactions were governed by the act.

offers to lease or rents or offers for rent any real estate or the improvements thereon for others, as a whole or partial vocation, *or who sells or offers for sale, buys or offers to buy, leases or offers to lease, or negotiates the purchase or sale or exchange of a business, business opportunity, or the good will of an existing business for others,* or who, as owner or otherwise, engages in the sale of real estate as a principal vocation. [1943 PA 57.]

From these legislative actions, I conclude that the Legislature made a deliberate and conscious decision not to eliminate activities formerly performed by business chance brokers, but to *reassign* to real estate brokers those activities previously performed by business chance brokers. Therefore, an evaluation of those activities historically performed by business chance brokers is particularly instructive on understanding the definition of these activities reassigned to real estate brokers that are at issue in this case.

Before its statutory introduction in 1919, the term "business chance broker" did not exist in Michigan. The term and its function were entirely a creation of the Legislature.[8] While there are but a few cases addressing the "business chance broker," there is clear indication in our case law that

---

[8] See *Miller v Stevens*, 224 Mich 626, 630-631; 195 NW 481 (1923). "[C]ounsel cite us to no authority, and we have not discovered any, where the subject of 'business chance broker' is mentioned or discussed, outside the act referred to, which apparently coined the term and defines it for the purposes of the act."

the activities of a business chance broker were not limited to transactions involving real estate.

*Hague v DeLong*, 292 Mich 262; 290 NW 403 (1940), involved the stock sale of a company.  There, this Court held that a brokerage firm was precluded from collecting a commission on the sale of all the capital stock of a company because plaintiff was not licensed as a business chance broker.[9]  The issue dividing the evenly split Court in *Hague* was whether the agreement was for the mere sale of stock or for the "sale of a business" within the meaning of the act.  The prevailing side held that the agreement was for the sale of the business and that the sale of stock was merely incidental.[10] The dissent concluded that the agreement was merely for the sale of stock. The dissent acknowledged, however, that if the purpose of the stock transaction were the sale of the business, plaintiff would be precluded from recovery because he was not licensed

---

[9] Plaintiff arranged the sale of all the capital stock of the American Broach and Machine Company to the Sundstrand Machine Tool Company. The sale of the stock "would result in a transfer of the business, at least *pro tanto*." *Id*. at 296.

[10] In support of the conclusion that the Sundstrand Company purchased the business and not merely the stock, the opinion indicates that, in addition to the stock, Sundstrand subsequently purchased "valuable patents and patents pending, the services of Mr. Lapointe, a lease, and an option to purchase the real estate and buildings." *Id*. at 277.  These items were apparently not part of the commission agreement between plaintiff and defendant.

14

as required by the act.[11]

Thus, in *Hague*, decided three years before the statutory transfer of the functions of business chance brokers, the activities of a business chance broker were unanimously determined to encompass efforts that did not involve real estate transactions—in that case, the sale of stock. The majority here not only ignores the plain meaning of the words, but also the historical meaning given to the business chance broker provisions. To the contrary, I believe that the clear language of the statute, in addition to the historical meaning given to "business chance brokers," militates against a conclusion that the Legislature in 1943 intended that the transferred business chance broker duties became limited to only those transactions involving real estate. Thus, contrary to the majority's assertion that stockbrokers were not "intended to fall within REBA," *ante* at 11, the statutory text and historical construction of this language indicate that stockbrokers were *in fact* subject, as business chance brokers, under identical statutory language.

It is certainly within the Legislature's constitutional prerogative and authority to decide what activities require

---

[11] The dissent also acknowledged that, *because there was no sale of an interest in real estate*, the commission agreement was not required to be in writing for the purpose of the statute of frauds. *Id*. at 302.

15

licensure. I tend to agree that the choices made by the Legislature in enacting legislation regulating business chance brokers, and subsequently real estate brokers, may make little sense in today's economy. However, I do not believe that this Court has the constitutional authority to "fix" the statute to better suit our modern economy according to our own policy assumptions. Rather, it is the responsibility of the Legislature to rescind or amend statutes that are no longer viable.

Under the clear language of the statute, supported by the historical interpretation and eventual transfer of the activities of the business chance broker into those assigned to real estate brokers, I believe that the statute encompasses the brokerage of business opportunities that do not involve real estate transactions. Therefore, the plaintiff was required to be a licensed real estate broker as a precondition to entering into the alleged contract and is now precluded by MCL 339.2512a from suing to enforce any such contract.

Accordingly, I respectfully dissent from the majority opinion and would affirm the decision of the Court of Appeals.

Robert P. Young, Jr.

16

# S T A T E   O F   M I C H I G A N

## SUPREME COURT


G. C. TIMMIS & COMPANY,

    Plaintiff-Appellant,

v                                  No. 120035

GUARDIAN ALARM COMPANY,

    Defendant-Appellee.

_____

WEAVER, J. (*dissenting*).

I dissent from the majority for the reasons stated in parts A and C only of Justice Young's dissent.

                            Elizabeth A. Weaver