Cavanagh, J.
(dissenting). I dissent from the majority opinion, which holds that Liberty Hill Housing Corporation, a nonprofit organization that leases housing to disabled or low-income individuals, did not qualify for *67 the charitable-institution property-tax exemption under MCL 211.7o(l) because it did not occupy the properties at issue. I disagree that the Legislature intended the term “occupy,” as used in MCL 211.7o(l), to mean “reside in or on” or “to be a resident or tenant of; dwell in.” This cannot be the meaning intended by the Legislature, because it is inconsistent with the statute’s subsequent use of the term and the statute’s purpose.
The key issue in this case is the meaning of the term “occupied” as it is used in MCL 211.7o(1), which exempts from taxation “[r]eal or personal property owned and occupied by a nonprofit charitable institution .. . .” The majority opinion rejects the definition of “occupied” that denotes ownership, “to have, hold,... possess,... or claim,” reasoning that the term “occupied” must mean something other than ownership because MCL 211.7o(1) uses the conjunctive phrase “owned and occupied.” Ante at 56-57. But there are several definitions for the term, so ruling out the meaning that denotes ownership only eliminates one alternative. The entire entry for the term “occupy” in the dictionary used by the majority opinion suggests six different meanings:
—v.t. 1. to have, hold, or take as a separate space; possess, reside in or on, or claim: The orchard occupies half the farm. 2. to be a resident or tenant of; dwell in. 3. to fill up, employ, or engage: to occupy time reading. 4. to engage or employ the mind, energy, or attention of: We occupied the children with a game. 5. to take possession and control of (a place), as by military invasion. —v.i. 6. to take or hold possession. [Webster’s Universal College Dictionary (1997).]
Moreover, consulting a different dictionary yields additional variations of the definition, illustrating a hazard of singularly employing dictionary definitions to discern legislative intent. For example, Black’s Law Dictionary *68 (8th ed) articulates one definition of “occupancy” as “the use to which property is put,” which bears some relation to the third Webster’s definition: “to fill up, employ, or engage.”[1] The majority cursorily dismisses three of the alternative Webster’s definitions as “clearly not relevant,” but accuses me of selectively quoting from Black’s Law Dictionary. Ante at 57, 59. However, I have not presented alternative dictionary definitions to argue that “my” dictionary is more authoritative than the majority’s dictionary; rather, I raise them to draw attention to the inadequacy of a dictionary-driven approach to statutory interpretation. The practice of reaching for a dictionary to define common words in a statute risks serving to merely confirm the writer’s assumed meaning of the word, rather than to actually advance the writer’s legal analysis.[2] While dictionaries are certainly useful tools of statutory interpretation, there are circumstances in which consulting a dictionary will not itself resolve the proper meaning of a statutory word or phrase.
This case presents such a circumstance — in which consulting dictionaries yields a number of possible meanings of the term “occupied.” As a result, discerning the most appropriate meaning requires further *69 analysis. Several principles of statutory construction aid in determining how the term “occupied” should be understood in MCL 211.7o(1). A phrase must be construed in light of the phrases around it, not out of context. Koontz v Ameritech Services, Inc, 466 Mich 304, 318; 645 NW2d 34 (2002). Similarly, when construing a statute, a court must read it as a whole. G C Timmis & Co v Guardian Alarm Co, 468 Mich 416, 421; 662 NW2d 710 (2003). Particularly relevant here is the commonsense principle that “ ‘ “[identical language should certainly receive identical construction when found in the same act.” ’ ” Empire Iron Mining Partnership v Orhanen, 455 Mich 410, 426 n 16; 565 NW2d 844 (1997), quoting Tryc v Michigan Veterans’ Facility, 451 Mich 129, 155; 545 NW2d 642 (1996) (Riley, J., dissenting).
When a statute repeats terms, it is logical to infer that they have the same meaning in each instance. The statute at issue here uses the term “occupied” twice within the same sentence: “Real or personal property owned and occupied by a nonprofit charitable institution while occupied by that nonprofit charitable institution solely for the purposes for which that nonprofit charitable institution was incorporated is exempt from the collection of taxes under this act.” MCL 211.7o(1) (emphasis added). The statute’s two uses of the term “occupied” should be consistent in meaning. But interpreting “occupied” to relate to residency, as the majority opinion suggests, is incongruous with the statute’s second use of the term “occupied.” That interpretation would require that an institution resided in property solely for a particular purpose. One’s residency of property does not commonly have any purpose other than residency, or dwelling, itself. By contrast, the use of property might be for a particular purpose. It would be entirely appropriate to state that an institution used *70 property solely for a particular purpose, such as a medical, educational, or recreational purpose. The second instance of “occupied” should be understood as synonymous with “used,” because it is the most appropriate definition for that context. Interpreting “occupied” to relate to use would also be appropriate for the first instance of the term, which confirms that the Legislature intended this meaning.
Additionally, interpreting “occupied” as synonymous with “used” comports with the function of the statute, whereas interpreting “occupied” to relate to residency does not. The exemption described in MCL 211.7o(1) applies only to nonprofit charitable institutions; it never applies to individuals. Applying the term “reside” to an institution is a strained and odd interpretation. Unlike people, institutions are inanimate and do not typically reside in a place. Notably, the majority articulates the following definition of “reside” from Webster’s: “1. to dwell permanently or for a considerable time; live. 2. (of things, qualities, etc.) to be present habitually; be inherent ([usually followed] by in).” Ante at 58. The first definition of “reside” clearly does not apply to institutions, because institutions do not dwell or live anywhere. The second definition of “reside” does not apply because an institution would not be inherent in a particular piece of property.
Further, the statute applies broadly to “real or personal” property, not simply residential property. Not all property that is eligible for exemption is susceptible to being resided in. For example, if a nonprofit charitable institution owned land that contained a swimming pool, it would be inapt to state that the institution occupied the swimming pool in that it resided in the pool. But it would be entirely appropriate to state that the institution occupied the swimming pool in that it operated the *71 pool and, further, that it operated the pool in fulfillment of its charitable purpose.[3] Thus, the term “occupied” must be construed so that it applies to the broad range of property that could be exempt under MCL 211.7o(l).
Finally, Michigan caselaw supports interpreting the term “occupied” to mean “used” in the context of this exemption. In Oakwood Hosp Corp v State Tax Comm, 374 Mich 524; 132 NW2d 634 (1965), the predecessor of MCL 211.7o was at issue. The statute exempted from taxation property that was “owned and occupied” by “library, benevolent, charitable, educational or scientific institutions . .. while occupied by them solely for the purposes for which they were incorporated.” Id. at 528. This Court held that houses owned by the plaintiff hospital, which were used for dwelling purposes for resident physicians and their families, were exempt under this provision. Id. at 530-532. The hospital charged the residents $100 a month to defray the cost of the housing, which was located at the edge of the hospital property and fronted a public street in a residential neighborhood. This Court reasoned that the houses were built to be necessary accessories to the hospital, because there was a shortage of housing close to the hospital and the resident physicians needed to be available to serve at the hospital on short notice. Id. at 527. It concluded that “[t]he houses are used as part of the hospital operation and are incidental thereto. Exemption under the statute applies.” Id. at 532 (emphasis added).[4] Clearly, Oakwood interpreted the term *72 “occupied” to mean the use of the property. The focus in Oakwood was not simply who physically “resided in” the property, but whether the use of the property was within the hospital’s scientific purpose. This Court viewed the resident physicians as an extension of the hospital because they were so integral to the hospital’s purpose; accordingly, their tenancy and use of the housing was attributed to the hospital.
Therefore, if the term “occupied” is understood to relate to the use to which property is put, the question here is whether Liberty Hill occupied the properties when it leased them to these particular tenants. The relationship between Liberty Hill and its tenants is analogous to the relationship between the hospital and the medical residents in Oakwood. A hospital’s narrow purpose is to provide medical care at the hospital, but Oakwood recognized that enabling medical residents to get to the hospital quickly was necessary to that purpose. Accordingly, even though actual medical care did not occur in the houses, the relationships between the medical residents, their housing, and the hospital were so intertwined that this Court regarded housing the medical residents as an operation of the hospital that was within its scientific purpose. The fundamental purpose of Liberty Hill is to enable low-income or disabled people to live independently, rather than in institutions or group homes. The physical manifestation of Liberty Hill’s operations is not just its central office, but also in having Liberty Hill’s tenants occupy the houses. If Liberty Hill’s tenants do not live in the houses, Liberty Hill’s purpose is not fulfilled.
Further, the tenancy arrangements demonstrate a unique relationship between Liberty Hill and its ten *73 ants. All Liberty Hill tenants are referred by Community Living Services, Liberty Hill’s parent corporation. Liberty Hill’s sample lease appears to be a standard lease, except that it includes a provision that “Community Living Services shall assist the tenant in complying with the terms of this lease.” Unlike a standard landlord-tenant relationship, Liberty Hill has specifically agreed to work with the tenant to fulfill the lease requirements. Further, Community Living Services contracts to provide a number of services to Liberty Hill tenants at the properties. Support services include transportation, personal-care assistance, support for work, recreation, community involvement, and healthcare service. The aid given in a particular tenant’s home could amount to care being provided 24 hours a day, seven days a week, depending on the tenant’s needs. Thus, between assisting the tenant with complying with the lease and providing support services, it is clear that Liberty Hill operates in the properties, even though the tenants physically reside in them.
In addition to the services that Liberty Hill provides through Community Living Services, the financial arrangements indicate that Liberty Hill does not have a standard landlord-tenant relationship with its tenants. All of Liberty Hill’s tenants qualify for Supplemental Security Income, which amounts to approximately $600 a month and is usually the only source of income for each tenant. Tenants pay no more than one-third of their income to rent, usually about $200 a month. Liberty Hill receives governmental funds and donations that offset the remainder of the housing-related expenses, such as the mortgage, insurance, and maintenance. But in four of the last five years, Liberty Hill has operated at a deficit. The financial circumstances indicate that Liberty Hill is not leasing the houses as a typical landlord, but is leasing the houses as an integral *74 part of its mission. Just as the houses in Oakwood would not have been exempted from taxation if they had been rented to people unrelated to the hospital, the Liberty Hill houses would not be exempt if they were rented to tenants who were not referred by Community Living Services and who did not meet Liberty Hill’s criteria.
Leasing the properties to particular low-income or disabled tenants and maintaining a relationship with them was integral to Liberty Hill’s operation. Thus, Liberty Hill occupied the properties within the meaning of MCL 211.7o(1) because it used the properties as part of its institutional mission. Moreover, it occupied the properties solely for the purposes for which it was incorporated, as required by MCL 211.7o(1). I would reverse the judgment of the Court of Appeals.
KELLY, J., concurred with CAVANAGH, J.

 The other four alternative definitions include:
1. The act, state, or condition of holding, possessing, or residing in or on something; actual possession, residence, or tenancy, [especially] of a dwelling or land.... 2. The act of taking possession of something that has no owner (such as abandoned property) so as to acquire legal ownership.... 3. The period or term during which one owns, rents, or otherwise occupies property. 4. The state or condition of being occupied. [Black’s Law Dictionary (8th ed).]

 See Hoffman, Parse the sentence first: Curbing the urge to resort to the dictionary when interpreting legal texts, 6 NYU J Legis & Pub Pol’y 401 (2003).

 Despite its devotion to the dictionary, the majority departs from its chosen definition when it is convenient or necessary to do so, such as in the swimming-pool hypothetical. The shortcomings of its chosen dictionary definition lead the majority to craft its own definition of “occupy” — to maintain a regular physical presence. Ante at 60.

 The majority’s argument that Oakwood and the other cases addressing this exemption did not concern the “owned and occupied” element of *72 the exemption statute is irrelevant because the term “occupied” should have the same meaning in both instances in the statute.