# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* KOZLOWSKI, Minors.

UNPUBLISHED
July 12, 2016

Nos. 330043, 330044
Livingston Circuit Court
Family Division
LC No.  14-014681-NA

Before:  OWENS, P.J., and BORRELLO and O'BRIEN, JJ.

PER CURIAM.

In this consolidated appeal, respondent mother (Docket No. 330043) and respondent father (Docket No. 330044) both appeal the order of the trial court terminating their parental rights to their minor children DAK, DEK, and JK, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm).  For the reasons set forth in this opinion, we affirm.

## I.  FACTUAL BACKGROUND

Respondents were married in March of 2008.  Both respondents acknowledged that their relationship was tumultuous at times and that there were several break ups.  Respondent mother gave birth to twins JK and RK shortly before the initiation of these proceedings.  Respondent father was not their biological father but he indicated his desire to raise them as his children. The twins were both born prematurely and with respiratory issues.  At that time, respondent mother smoked about a half a pack of cigarettes a day and respondent father smoked about two packs a day.  On March 3, 2014, respondents were separated and respondent mother was told that she, DEK, JK, and RK had to leave her brother's place[1] because her brother's girlfriend did not want to be around the children.  She testified that she went to stay with her cousin that evening because she had no place else to go but that she planned to go to either her mother's or grandmother's the next day.  Respondent mother acknowledged that her cousin's house was filthy; there was pet litter throughout, mildew on dishes and the toilet, and tobacco covering the kitchen table. Respondent mother further acknowledged that three to four adults were living and smoking in the house.  She and the three children slept on the sofa that evening.  In the morning,

---

[1] DAK was staying with respondent father's parents in Florida.

RK was found unresponsive and was unable to be resuscitated by paramedics. Respondent father, who was staying with a friend in Flint, claimed that if he had known that respondent mother and the children were going to stay in that house that evening, he would have found a different place for them to stay.

Upon RK's death, DEK and JK were taken into protective custody. DAK was returned from Florida and placed in protective custody with his siblings.

Respondent father entered a plea on April 4, 2014 and acknowledged that he had ADHD and had not been taking his medication. Respondent mother entered a similar plea on May 13, 2014, also acknowledging that she had ADHD and had not been taking medication. The trial court accepted both pleas finding that grounds for adjudication had been met because there was a substantial risk of harm to the children due to an unfit home by reason of neglect and depravity. Both respondents participated in psychological evaluations in April of 2014 that identified mental health concerns as a barrier to reunification. Respondent mother also testified that respondent father had a history with alcohol and marijuana, and respondent mother tested positive for marijuana early on in the case. Around the time of adjudication, respondents were separated and both lacked stable housing, simply sleeping at the homes of friends or family. At one point, respondent father went to Caseville and claimed that he performed some work at a campground there but provided no documentation. Both respondents relied either on friends or on the public bus system to attend parenting times.

Respondents' initial caseworker, Patricia Galea, testified to meeting with both respondents and identifying the barriers to reunification as being issues with housing, respondent father's substance abuse, income, parenting skills, and their relationship with each other. Galea stated that she gave respondent mother information on housing assistance but she did not follow through. Galea indicated that respondents were inconsistent in attending parenting times. Galea testified that she referred respondent father for a substance abuse assessment but he did not attend.

In the fall of 2014, respondent father moved back from Caseville and reunited with respondent mother. Around that time Stephanie Langham became respondents' case worker. Langham was able to move parenting times closer to where respondents were living and ensured that they were provided with bus passes and gas cards to aid in their attendance at parenting times. Langham acknowledged that the foster family cancelled a number of visits due to the children's illnesses. Respondents both testified that these cancellations made it harder for them to find transportation to future visits. Nonetheless, Langham testified that respondents had consistent visits while she was the case worker. Around this time respondents quit smoking cigarettes and began using e-cigarettes.

During a hearing on January 27, 2015 the trial court ordered Langham to file a termination petition at the request of the lawyer-guardian ad litem. Langham later testified that she therefore did so but did not personally believe that termination of parental rights was warranted at that point. The termination hearing was set for April of 2015 but was adjourned due to respondents having secured housing and maintained semi-stable employment. Specifically, respondents had begun sub-leasing a room in a house that was primarily rented by James Clark. Langham and another caseworker, Jahada Turner, testified that the house was appropriate for

children. Turner indicated that she performed a background check on Clark and that it did not reveal any criminal history. Respondents submitted conflicting documentation regarding the amount of rent they were to pay each month, at one point submitting receipts stating that rent was $200 and at a later point submitting evidence of a purported lease agreement that stated rent was $250 a month. Respondents did not produce Clark's lease with his landlord.

Respondent father obtained a sizeable settlement check in April of 2015 based on a 2012 accident. With this money, he purchased a vehicle and obtained insurance for it. By early summer, he testified, he had obtained employment that required him to work long hours six days a week and earned over $500 a week. However, the only documentation of his employment given to caseworkers was a $250 pay stub, and he acknowledged that this job would only keep him employed during the summer months.. He testified that he and respondent mother received over $300 a month in food stamp assistance. Respondent mother testified that she was receiving $20 a day from an insurance company to take care of respondent-father on account of a second accident that he had been involved in.

Respondents both testified to general knowledge of their children's medical conditions, such as breathing problems and surgeries. Respondent mother provided more detail but also stated that none of her children had "special needs," contrary to Galea's testimony that all the children had "special needs." Additionally, respondent mother was not able to provide detailed information about her children's current immunization status or mental health services. Respondents both testified that they asked questions of caseworkers, doctors, and the foster parents but did not receive responses. Regarding activities, respondents both testified that they were not informed of DAK's participation in baseball and DEK's participation in gymnastics. Langham corroborated respondents' testimony that the foster parents did not always provide information regarding the children's appointments. However, respondents acknowledged that they were present for several surgeries and hospital stays that the children had during the pendency of the case.

Galea, Langham, and Turner stated that respondent father had either missed drug screens or had positive screens. Langham testified that respondent mother had missed some drug screens as well. Turner stated that respondent father used work as an excuse but did not provide her with work schedule verification. Respondents testified that they had emotional bonds with their children that were displayed during parenting times. Respondents testified to being upset when they learned from their children that they had been directed to refer to their foster parents as mom and dad.

A three-day termination hearing was held before a referee in July, August and September, 2015. At the termination hearing, Turner testified that one of the biggest barriers that remained unresolved was respondents' mental health issues. Turner specifically stated that respondent mother had missed a lot of her therapy appointments. Respondent father acknowledged that his psychological evaluation recommended counseling; he requested a specific provider that petitioner was unable to pay for. Both respondents attended and completed parenting classes. However, Turner testified that after July of 2015 respondents stopped engaging with services altogether.

Despite testifying that he made over $2,000 a month in his present job and he and respondent mother were receiving over $300 a month in food stamps, respondent father testified that he had only a little over $500 in savings at the bank even with the couple's largest monthly expense being the $200 or $250 they paid Clark in rent. Respondent father testified that he had more money entrusted to family members.

Langham did not believe that termination was appropriate because respondents had secured housing and because respondent father had secured a job with stable income. Turner disagreed. Turner focused on the lack of progress towards respondent's mental health goals. Turner was also concerned about the evidence of stability regarding respondents' housing situation. While acknowledging that there was no evidence suggesting that respondents would be unable to reside with Clark long-term, Turner was bothered by the fact that respondents did not have a contingency plan and were unable to provide a copy of Clark's lease with the primary landlord. Turner testified that the children were in need of stability and permanency. Turner stated that it was unlikely respondent-mother would be able to resolve her mental health issues in six months' time and that the children could not wait that long for stability and permanence.

The referee issued a written recommendation on October 13, 2015 terminating respondents' parental rights. The referee first found that grounds for termination existed under MCL 712A.19b(3)(c)(*i*), stating that the conditions that led to adjudication were the death of RK and a longstanding history of neglect due to lack of housing, unstable mental health, and substance abuse. The referee found that neither parent had complied with drug testing, and that it was problematic that respondents and Langham believed that the only barriers to reunification were a job and a house. The referee believed Turner's testimony that emotional stability and substance abuse were also barriers. The referee found that the documentation provided to make their housing situation seem stable was inadequate because there were conflicting amounts of rent on the various documents. The referee was also troubled by the fact that, despite appearing to have sufficient income, mother still needed the department or Wellspring to provide her with a bus pass.

The referee next found grounds for termination under MCL 712A.19b(3)(g), noting respondents' failure to follow through with the counseling recommended by their psychological evaluations and that mother's attendance was dismal and father demanded a certain provider that petitioner had no means to fund. The referee also was troubled by mother's belief that RK died of SIDS, describing this as a failure to internalize the changes that she would be required to make.

The referee also found grounds for termination under MCL 712A.19b(3)(j). The referee noted that RK died in the care of respondents, noted mother's decision to stay in the crowded, smoke-filled, and filthy home and that father made no effort to know of the condition in which his children were living that evening, and noted lack of income and untreated mental health as indications that the children would be at risk if returned.

Finally, the referee concluded that termination was in the best interests of the children. The referee acknowledged that the children and parents had a bond, but found that respondents' problems with substance abuse and mental instability showed that they could not provide a safe

and stable home. The referee also focused on the parents' lack of knowledge regarding the children's needs.

The trial court entered an order adopting the referee's recommendation to terminate parental rights and ordered respondents' parental rights terminated on October 14, 2015. These appeals ensued.

## II. STANDARD OF REVIEW

This Court reviews "for clear error both the trial court's decision that a ground for termination of parental rights has been proved by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interests." *In re JK*, 468 Mich 202, 209; 661 NW2d 216, reh den 468 Mich 1239 (2003); MCR 3.977; *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A decision is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re JK*, 468 Mich at 209-210.

## III. ANALYSIS

On appeal, respondents each argue that the trial court improperly considered their failure to participate in mental health and substance abuse services as evidence of neglect when, according to respondents, mental health and substance abuse were not issues that led to the initial adjudication. Respondent father also argues that petitioner failed to provide adequate services. Respondents also each argue that the trial court erred in its determination that statutory grounds for termination of parental rights existed. Finally, respondent mother argues that termination of her parental rights was not in her children's best interests.

## A. SERVICES

Respondents argue that their failure to participate in certain mental health and substance abuse services that they believe were not necessary to rectify conditions that led to adjudication should not have been used as evidence of neglectful behavior or as evidence that they failed to rectify the conditions that led to adjudication. Respondent father also argues that adequate services were not provided. However, a review of the record indicates that there was ample evidence for the trial court to conclude that respondents' mental health and substance abuse were issues at the initial adjudication and that petitioner offered father adequate services.

Both respondents acknowledged having untreated ADHD at their pleas. Both acknowledged that their April 2014 psychological evaluations revealed mental health concerns. Respondent mother testified that respondent father had past problems with alcohol and marijuana, and Galea reported that respondent mother had an early positive test for marijuana. While issues with housing, income, tobacco use, and transportation were issues that resulted in respondent mother being in the home with the children where RK died, it appears that respondents' mental health and substance abuse issues were underlying causes of some of these concerns and even primary concerns themselves. The trial court did not err in determining that respondents' failure to adequately participate in mental health services or drug screens was

-5-

evidence of a failure to provide proper care and custody and evidence that the conditions that led to adjudication had not been remedied.

Father also contends that petitioner failed to offer adequate services when it would not pay for counseling services for him and that he was required to obtain his own private insurance. This argument lacks merit.

Prior to termination, petitioner must show that reasonable efforts were made to "rectify the conditions that led to its involvement in the case." *In re Terry*, 240 Mich App 14, 25-26; 610 NW 2d 563 (2000). If a case service plan "fails to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family." *Id.* at 26. "The reasonableness of the efforts provided affects the sufficiency of the evidence supporting the grounds for termination." *In re Hicks/Brown*, ___ Mich App at ___; ___NW2d___ (2016) (Docket No. 328870) slip op at 6.

What father appears to be referring to is that petitioner was unable to pay for his specific choice of provider. Father indicated that he had been requesting to see a specific provider, "Taylor Psychological." Langham clarified that petitioner would not pay for the specific provider that father wanted for his therapy. The trial court was correct to note that while petitioner "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). There is sufficient evidence in the record to show that father, despite requesting a specific provider for his counseling, failed to participate in the services that were offered. Galea testified that father did not go for a substance abuse assessment despite a referral. Langham testified that father was not consistent with substance abuse drops. Turner testified that father was not consistent with drug screens and that, despite using work as an excuse, did not provide her with a work schedule verification.

In short, petitioner made reasonable efforts to "rectify the conditions that led to its involvement in the case." *In re Terry*, 240 Mich App at 25-26.

## B. STATUTORY GROUNDS FOR TERMINATION

Respondents argue that the court erred in finding statutory grounds for termination. We disagree.

The trial court first found termination was proper under MCL 712A.19b(3)(c)(*i*), which provides that termination is appropriate if the conditions that led to the initial adjudication continue to exist 182 days after the initial dispositional order and "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." The conditions that the trial court determined led to adjudication that continued to exist were housing, income, mental health, and substance abuse. Respondents did make concerted efforts to rectify the issues of housing and income. They had maintained a suitable living environment for a significant duration at the time of the termination hearing. However, evidence about this arrangement's stability was conflicting. Respondents were subleasing and the primary tenant's lease was never verified. There was conflicting evidence on the amount of money

-6-

respondents had to pay Clark each month. While there was no evidence definitively suggesting that the arrangement was unstable, we are not left with a definite and firm conviction that the trial court mistakenly questioned its stability in light of respondents' failure to have a contingency plan and Galea's testimony that she had given respondent mother information on housing assistance when the case began in early 2014 and mother had not followed through with that information. Given this conflicting evidence, we cannot say that the trial court clearly erred in finding that housing remained an issue at the time of termination and that it was unlikely to be rectified within a reasonable amount of time.

Regarding income, respondents both testified that respondent father was earning about $2,000 a month. However, the evidence concerning father's income was even more tenuous than the evidence regarding housing. Respondents only provided one pay stub to case workers and the pay stub did not substantiate father's purported earnings and father acknowledged that the job would only last until the end of summer. Additionally, despite stating that they only had to only pay $200 or $250 in rent per month and that they were receiving over $300 a month in food stamp assistance while father was making over $500 a week, respondents both reported only having $550 in savings. Respondent father testified that various family members were holding his money for him but he was vague on specifics. Furthermore, there was a history of father and mother separating and mother had not obtained suitable income to provide for the children in the event of another separation. On this record, we are not left with a definite and firm conviction that the trial court erred in concluding that unstable income remained an issue at the time of termination and that there was no reasonable likelihood that it would be corrected within a reasonable amount of time.

Mental health and substance abuse were also issues that remained at the time of termination. Respondent mother had missed appointments, and respondent father had insisted on a certain provider that petitioner could not pay for. Both parties were inconsistent throughout the case with drug screens, and respondent father did not attend a substance abuse assessment despite being referred. The trial court's conclusion that mental health and substance abuse were concerns that caused adjudication and had not been rectified was not clearly erroneous.

In short, the trial court did not clearly err in finding grounds for termination under MCL 712A.19b(3)(c)(*i*). Because we have found one statutory ground for termination, we need not consider the additional grounds cited by the trial court. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

## C. BEST INTERESTS

Finally, respondent mother challenges the trial court's best interest determination.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The trial court must find by a preponderance of the evidence that termination is in the best interests of the children. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "[R]egard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Miller*, 433 Mich at 337. The

children's bond to the parent, the parent's parenting ability, and the children's need for permanency, stability, and finality are all factors for the court to consider in deciding whether termination is in the best interests of the children. *In re Olive/Metts Minors*, 297 Mich App at 41-42.

The trial court determined that there was a strong bond between mother and the children but concluded that termination was still in the children's best interests. It found that the lack of ability to understand the children's special medical needs, the inability to sufficiently benefit from services, and the children's need for permanence and stability indicated that termination of parental rights would be in the children's best interests. While there is some indication that respondent mother's lack of information regarding the children's medical conditions was partly attributable to the lack of communication provided by the foster family, the trial court correctly noted that respondent mother had been present at a surgery where she could have obtained more information. Furthermore, a caseworker testified that there was a history of medical neglect when the children were in mother's care; and, despite one of the children having respiratory problems, both father and mother continued to smoke. In contrast, all of the children's medical needs were being addressed in foster care. Moreover, there was evidence that respondent mother had not adequately addressed her mental health issues. Additionally, that the children needed permanence and stability was supported by Turner's testimony that the existing problems could not be rectified in six months' time and that the children could not wait that long. In short, the trial court did not clearly err in finding that termination of mother's parental rights was in the children's best interests. *In re Olive/Metts Minors*, 297 Mich App at 41-42.

Affirmed.

/s/ Donald S. Owens
/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien